## ELLINGHAM, SECRETARY OF STATE, ET AL. *v.* DYE.

[No. 22,064. Filed July 5, 1912. Rehearing denied October 18, 1912. Appeal to U. S. Sup. Ct. dismissed December 1, 1913.]

1. CONSTITUTIONAL LAW. — *Legislative Authority.* — *Fundamental Legislation.*—Under Art. 4, §1, of the Constitution, providing that the legislative authority of the State shall be vested in the General Assembly, the General Assembly is supreme and sovereign in the exercise of the law-making power thus conferred upon it, subject only to such limitations as are imposed, expressly or by clear implication, by that instrument and the restraints of the Federal Constitution, and the laws and treaties passed and made pursuant to it, but this general grant of legislative power does not include authority over fundamental legislation, or to draft and submit to the people a proposed new Constitution. pp. 343, 357, 361, 380.

2. CONSTITUTIONAL LAW.—*Legislative Authority.*—The legislative authority conferred by Art. 4, §1, of the Constitution, is the power to make, alter and repeal laws, as rules of civil conduct, pursuant to the Constitution, except as to matters wherein such authority has been delegated to the Federal government. p. 343.

3. CONSTITUTIONAL LAW.—*Constitution.*—*Statutes.*—*Distinction.*—A constitution is a fundamental act of legislation by the people themselves, in their sovereign capacity, establishing the structure and mechanism of their government, while a statute is legislation by their representatives, subject to the limitations prescribed by the Constitution. p. 345.

4. CONSTITUTIONAL LAW.—*Amendment of Constitution.*—*Power of General Assembly.*—*Construction.*—In proposing amendments to the Constitution, the General Assembly is not in the exercise of the ordinary functions of legislation authorized by the general grant of legislative power in Art. 4, §1, of the Constitution, but acts in a matter of fundamental legislation by virtue of the special grant of power conferred by that instrument in Art. 16, §§1, 2, providing the manner of proposing amendments and the sub-

mission of the same to the electors of the State, and which is a narrow and limited power designed to aid the people in the exercise of their sovereign power over the structure of their government. p. 348.

5. CONSTITUTIONAL LAW.—*Statutes.—Construction.—Rule.*— When the words of a statute, fundamental or ordinary, are brought forward into the new one, the meaning attached thereto is also brought forward. p. 361.

6. CONSTITUTIONAL LAW.—*Operation.—Specified Means for Exercise of Powers Conferred.—Right to Imply Other Means.*—Where the means are specified by which the power granted in a constitution shall be exercised, no other or different means for the exercise of such power can be implied, even though considered more convenient or effective than the means given in the constitution. p. 374.

7. CONSTITUTIONAL LAW.—*Legislative Authority.—Power to Draft Organic Law.*—The legislature has only that measure of power to draft organic law expressly granted to it through the Constitution (Const., Art. 16, §§1, 2), and that is to be exercised strictly in the mode provided. pp. 376, 383.

8. CONSTITUTIONAL LAW.—*Construction.—Implication of Power.*— Where a constitution confers a power or enjoins a duty, it also confers, by implication, all powers that are necessary for the exercise of the one, or for the performance of the other. p. 379.

9. CONSTITUTIONAL LAW.—*New Constitution.—Enactment by Legislature.—Validity.*—The act of the legislature (Acts 1911 pp. 205-243), incorporating therein a proposed new Constitution and providing for its submission to the people at the next ensuing general election for adoption or rejection, is void, considered either as a new Constitution or as a series of amendments, since, if considered as a proposed new Constitution, it is an act beyond the general legislative authority conferred by Constitution, Art. 4, §1; and it was not enacted pursuant to the requirements of Constitution, Art. 16, §§1, 2, providing the method for proposing and submitting amendments. p. 385.

10. CONSTITUTIONAL LAW.—*Judicial Powers.—Determination of Law.—Scope of Authority.—Determination of Organic Law.*—The power of the judicial department to determine and declare the law covers the whole body of the law, fundamental and ordinary, and the courts have the power, when it becomes a judicial question, to determine the validity of the proposal, submission or ratification of change in the organic law. p. 385.

11. CONSTITUTIONAL LAW.—*Judicial Powers.—Jurisdiction to Restrain Acts of Ministerial Board of Which Governor is a Member.*—Under the provisions of §6897 Burns 1908, Acts 1889 p. 157, §16,

that the Governor of the State, and two qualified electors by him appointed, shall constitute a state board of election commissioners, the duty cast upon the governor, in his capacity as a member of the board, by the act to submit a proposed new Constitution (Acts 1911 pp. 205-243), which requires the performance by such board of certain duties relating to the preparation of the ballots for the submission of such proposed Constitution, is purely ministerial and wholly disconnected from his functions as Governor of the State, so that the court is not ousted of its jurisdiction, in a suit to enjoin the state board of election commissioners from preparing the ballots for such submission, by the fact that the Governor is a member thereof. pp. 398, 399.

12. CONSTITUTIONAL LAW.—*Judicial Powers.—Interference With Executive.*—The courts are without power to direct by mandamus, or restrain by injunction, the acts of the Governor in duties strictly political and executive. p. 399.

13. INJUNCTION.—*Issuance of Writ.—Restraining Act of State Board of Election Commissioners.*—An injunction to restrain the state board of election commissioners from preparing ballots for the submission of a proposed Constitution, as provided in Acts 1911 pp. 205-243, will not be denied on the ground that the Governor, who is a member of such board, has supreme executive authority with control over the military forces of the State, and that the decree could not be enforced if he chose to disregard it, since the court has no right to reflect on any officer of a coördinate department by assuming that the law, as declared by the court, might be disregarded. p. 408.

14. CONSTITUTIONAL LAW.—*Proposed New Constitution.—Legislative Enactment.—Judicial Determination of Unconstitutionality of Act.—Infringement on Legislative Authority.*—The legislature being without authority to formulate and present a proposed Constitution to the people, its act in so doing is void, and its mandates, therein contained, of no more force than those of any citizen without authority under the Constitution, so that restraining the state board of election commissioners from performing the duties imposed by said act (Acts 1911 pp. 205-243) in preparing the ballots for the submission of such proposed Constitution, is not an interference by the court with legislative authority. p. 408.

15. INJUNCTION.—*Proposed Constitution.—Submission to Vote.—Constitutionality.—Right to Sue.*—The act of the legislature incorporating therein the draft of a proposed new Constitution and providing for its submission to the people at the next ensuing general election, being unconstitutional, the plaintiff, as a citizen and taxpayer of the State, has capacity to sue for himself and on behalf of all other citizens and taxpayers to enjoin the state board of tax commissioners from preparing ballots for submitting

the same, and his competency to sue is not affected by the smallness of the proportionate sum of the cost of the election which would fall upon him. p. 413.

From Marion Circuit Court (20,079); *Charles Remster,* Judge.

Suit by John T. Dye against Lew G. Ellingham, Secretary of State, and others, constituting the State Board of Election Commissioners. From a decree for plaintiff, the defendants appeal. *Affirmed.*

*Thomas M. Honan, James E. McCullough, Stuart, Hammond & Sims, Roby & Watson, Stotsenburg & Weathers* and *Elias D. Salsbury,* for appellants.

*John T. Dye, Ralph K. Kane* and *Addison C. Harris, for* appellee.

Cox, C. J.—The General Assembly at its regular biennial session held in 1911, drafted and incorporated in a bill, what was therein termed a proposed new Constitution, which was a copy of the existing Constitution, with twenty-three amendments, or changes, of its provisions, and it provided, that it should, if adopted, take effect on January 1, 1913. There was no pretense of complying with or proceeding under provisions of the present Constitution for amendment of it. The bill duly passed both branches of the legislative body, with the usual formalities of ordinary legislation, was approved by the Governor March 4, 1911, and published with the acts of the session as chapter 118 (Acts 1911 p. 205). It is therein provided that the proposed organic instrument shall be submitted to all the legal voters of the State at the general election regularly to be held pursuant to law in November, 1912; and to that end it is provided that the state board of election commissioners shall prepare ballots as provided by law, and that all election officers and other officials required by law to perform any duties with reference to general elections shall perform like duties with reference to the submission of the so-called proposed new Constitution.

Certain ministerial duties are devolved upon the Secretary of State and the state board of election commissioners in relation to elections, which must apply to the submission of this proposed organic legislation to the people, if the act in question is a valid exercise of legislative authority. If it is, on the contrary, in violation of the existing Constitution, then they have no duty to perform in relation thereto.

This suit was instituted in the trial court by the appellee, a voter and taxpayer of Marion county, suing for himself as a citizen, elector and taxpayer in the State of Indiana, and also on behalf of and for the benefit of all the other citizens, electors and taxpayers in the State, to enjoin appellant Ellingham, as Secretary of State, and appellants Marshall, Bachelder and Roemler, constituting the state board of election commissioners, from the performance of these duties, on the ground that the General Assembly was without power thus to prepare and submit to the people proposed fundamental law, whether an entire new Constitution or an amendment; that the method of submission provided was in violation of a provision of our State Constitution; and that certain provisions of the proposed organic law are violative of provisions of the act of Virginia conveying to the United States the territory northwest of the Ohio river, the ordinance of 1787, the act of congress of 1816 to enable the people of the Indiana Territory to form a state Constitution and government, and article 4, §4, of the Federal Constitution, in the matter of guaranties of the principle of porportionate representation and of a republican form of government. After a hearing and argument in that court, memorable in the legal annals of the State, the learned judge of the circuit court sustained the contention of appellee in every respect, and enjoined and restrained appellants as prayed. From that judgment this appeal comes, and the delicate and difficult questions involved are presented to this court for final determination.

The underlying question involved, out of which all the

others presented grow, is simply, whether the act printed as Chapter 118 is a valid exercise of legislative power by the General Assembly. On this question appellants contend that the act involves the submission of a new Constitution to the people for adoption or rejection, and that the General Assembly is clothed with power to initiate, draft and submit a new Constitution to the people in such form and manner as to enable them to adopt it as the organic law of the State. This power, it is asserted, is included in the general grant of the legislative power of the government instituted by the existing Constitution, which is made to the General Assembly by article 4, §1, of that instrument, which provides that "the legislative authority of the State shall be vested in the general assembly."

Appellee, on the contrary, in support of the conclusion of the trial court that the act in question is unconstitutional and void, contends that the power to initiate, frame and submit to the people fundamental law is not legislative power in the sense in which the General Assembly is vested with legislative power by that provision. But the making of fundamental law, being essentially different from ordinary legislation, the power of the General Assembly in relation to it is measured by the special and limited grant of power to it, made by article 16 of the present Constitution to initiate, frame and submit amendments in the mode and manner therein provided; and that this, by necessary implication, withholds the right of the broader and more comprehensive exercise of the power so to participate in fundamental legislation involved in initiating, preparing and submitting a new Constitution. Appellee also contends that the draft embodied in Chapter 118 is not that of a new Constitution, but that it is in substance, truth and fact merely proposed amendments of the existing Constitution, and that therefore it cannot be lawfully submitted to the people for their action, because of noncompliance with the requirements of article 16.

In that remote and despotic period, when the sovereign king chartered rights and liberties to his subjects—the people—all governmental powers were assumed to be his by divine right. In him were combined the legislative, executive and judicial powers of government. He was the lawgiver, interpreter and enforcer. When the powers were executed by agents, the agents were his, and responsible to him alone. On this continent we came to the time when the people, by revolution, took to themselves sovereignty, and in exercising supreme political power chartered governments by written constitutions. These organic instruments declared and guaranteed the rights and liberties of the individual, which had come to the people through centuries of struggle against absolutism in government. The majority was to rule, but under restraints and limitations which preserved to the minority its rights. "By the constitution which they establish, they not only tie up the hands of their official agencies, but their own hands as well; and neither the officers of the State, nor the whole people as an aggregate body, are at liberty to take action in opposition to this fundamental law." Cooley, Const. Lim. (7th ed.) 56. The government so instituted was representative of the creator of it—the people. The agencies and agents for administering it were the people's agents. For greater surety of the maintenance of rights and liberties, and against encroachment and abuse of power, the governmental power inhering in the people was divided, and the three elements of it—the executive, legislative and judicial authority—in so far only as the people deemed it wise, and were willing to surrender or delegate power to agents, were delegated for exercise in the matter of carrying out the details of the purpose of government to three separate and distinct departments or agencies, independent of each other except to the extent that the action of one was made to constitute a restraint to keep the others within proper bounds, and to prevent hasty and improvident action.

Under such a Constitution the General Assembly of our State is clothed with legislative authority in the words of article 4, §1, quoted above. That the General Assembly is supreme and sovereign in the exercise of the lawmaking power thus conferred upon it, subject only to such limitations as are imposed, expressly or by clear implication, by the State Constitution and the restraints of the Federal Constitution, and the laws and treaties passed and made pursuant to it, has been uniformly declared by an unbroken line of decisions of this court from the beginning of the judicial history of the State to the present time. But this general grant of authority to exercise the legislative element of sovereign power has never been considered to include authority over fundamental legislation. It has always been declared to vest in the legislative department authority to make, alter and repeal laws, as rules of civil conduct pursuant to the Constitution made and ordained by the people themselves and to carry out the details of the government so instituted.

"The legislative power we understand to be the authority, *under the Constitution,* to make laws, and to alter and repeal them. Laws, in the sense in which the word is here employed, are rules of civil conduct, or statutes, which the legislative will has prescribed." Cooley, Const. Lim. (7th ed.) 131.

The legislative power which the general grant in our Constitution bestows upon the General Assembly, this court has held to be the power to make, alter and repeal laws. *State, ex rel.,* v. *Denny* (1889), 118 Ind. 382, 387, 21 N. E. 252, 4 L. R. A. 79; *City of Evansville* v. *State, ex rel.* (1889), 118 Ind. 426, 21 N. E..267, 4 L. R. A. 93; *State, ex rel.,* v. *Denny* (1889), 118 Ind. 449, 21 N. E. 274, 4 L. R. A. 65; *State, ex rel.,* v. *Hyde* (1889), 121 Ind. 20, 26, 22 N. E. 644.

In *Lafayette, etc., R. Co.* v. *Geiger* (1870), 34 Ind. 185, 198, it was said by Buskirk, J.: "When the constitution of a state vests in the General Assembly all legislative power, it is to be construed as a general grant of power, and as author-

izing such legislature to pass any law within the ordinary functions of legislation, if not delegated to the federal government or prohibited by the state constitution.''

The grant to the General Assembly of ''the legislative authority of the State'' did not transfer from the people to the General Assembly all the legislative power inhering in the former, but, as said in *McCullough* v. *Brown* (1893), 41 S. C. 220, 248, 19 S. E. 458, 23 L. R. A. 410, only ''such legislative power as may be necessary or appropriate to the declared purpose of the people in framing their constitution and conferring their powers upon the various departments constituted for the sole purpose of carrying into effect their declared purpose.'' The words ''legislative power'', in a constitutional delegation of general legislative authority, ''mean the power or authority under the constitution or frame of government to make, alter and repeal laws.'' *O'Neil* v. *American Fire Ins. Co.* (1895), 166 Pa. St. 72, 30 Atl. 943, 26 L. R. A. 715, 45 Am. St. 650.

To erect the State or to institute the form of its government is a function inherent in the sovereign people. To carry out its purpose of protecting and enforcing the rights and liberties of which the ordained constitution is a guaranty, by enacting rules of civil conduct relating to the details and particulars of the government instituted, is the function of the legislature under the general grant of authority. It needed no reservation in the organic law to preserve to the people their inherent power to change their government against such a general grant of legislative authority. And yet we find in the first section of the first article of the Constitution this statement of the purpose of the government which they had builded, and the declaration of their power over it: ''We declare that all men are created equal; that they are endowed by their Creator with certain unalienable rights; that among these are life, liberty, and the pursuit of happiness; that all power is inherent in the people; and that all free governments are and of right ought to be, founded

on their authority, and instituted for their peace, safety, and well-being. For the advancement of these ends, the people have, at all times, an indefeasable right to alter and reform their government.''

With knowledge of the tendency of vested power to broaden and exalt itself, the people have declared their abiding power over the framework of the government, while in article 4, §1, they gave into the hands of an agency the authority to exercise all their power to make laws to carry out the declared purpose of the government, save such as they had withheld by express or implied limitations, or had surrendered to the Federal government.

A state constitution has been aptly termed a legislative act by the people themselves in their sovereign capacity, and, therefore, the paramount law. Cooley, Const. Lim. (7th ed.) 242; *Sill* v. *Village of Corning* (1857), 15 N. Y. 297, 303. It has again been defined to be ''an act of extraordinary legislation by which the people establish the structure and mechanism of their government.'' *Eakin* v. *Raub* (1825), 12 Serg. & R. (Pa.) 330, 347. In *Sage* v. *Mayor, etc.* (1897), 154 N. Y. 61, 47 N. E. 1096, 61 Am. St. 592, 38 L. R. A. 606, a constitution is designated as a supreme enactment, a fundamental act of legislation by the people of the state. A constitution is legislation direct from the people, acting in their sovereign capacity, while a statute is legislation from their representatives, subject to limitations prescribed by the superior authority. *People, ex rel.,* v. *May* (1855), 3 Mich. 598. Jameson, in his work on Constitutional Conventions, a work which has evoked the unqualified approval of Judge Cooley in his Constitutional Limitations, in discussing the difference between fundamental and ordinary legislation, says: ''Ordinary laws are enactments and rules for the government of civil conduct, promulgated by the legislative authority of a state, or deduced from long-established usage. It is an important characteristic of such laws that they are tentatory, occasional and in

the nature of temporary expedients. Fundamental laws, on the other hand, in politics, are expressions of the sovereign will in relation to the structure of the government, the extent and distribution of its powers, the modes and principles of its operation, and the apparatus of checks and balances proper to insure its integrity and continued existence. Fundamental laws are primary, being the commands of the sovereign establishing the governmental machine, and the most general rules for its operation. Ordinary laws are secondary, being commands of the sovereign, having reference to the exigencies of time and place resulting from the ordinary working of the machine. Fundamental laws precede ordinary laws in point of time, and embrace the settled policy of the state. Ordinary laws are the creatures of the sovereign acting through a body of functionaries existing only by virtue of the fundamental laws and express, as we have said, the expedient, or the right, viewed as the expedient, under the varying circumstances of time and place. * * * fundamental laws are either structural, or expressive of the *settled policy* of the state; and second, that they may, consequently, be, as they theoretically are, laid down in advance, for ages to come; whilst, on the contrary, ordinary laws are merely temporary expedients or adjustments, and cannot be allowed to stiffen into constitutional provisions without extreme danger to the commonwealth; that, in other words, they have no place in a Constitution, and, therefore, as will be more fully shown in a subsequent chapter, are not proper subjects for the action of bodies charged with framing Constitutions.'' Jameson, Const. Conventions (4th ed.) 84-86. And again, in discussing the powers of a legislature he says: ''It is the body which pronounces the statute law of the State. All measures relating to the conduct or to the rights of individuals, to the administration, or defence of the government, which are not prohibited by the fundamental law or by the moral code, and which are yet deemed, on a large view of the public interests, to be expedient, are within the

competence of a legislature with the general powers of legislation conferred by our Constitutions. To this general statement of the extent of the power of our legislatures, the *proviso* must be appended, that the measures passed by those bodies must not be of the character denominated fundamental. The necessity of this *proviso* is apparent from the character of the American governments, before referred to, as distinguished from that of Great Britain, after which they were modeled. The Parliament of Great Britain is possessed of all legislative powers whatsoever. It can enact ordinary statutes, and it can pass laws strictly fundamental. Not so with our legislatures. Saving the single case, to be noted in a subsequent chapter, in which, by express constitutional provision, they act in conventional capacity, in the way of recommending specific amendments to their Constitutions, they have no power whatever to amend, alter or abolish those instruments. Subject, however, to this limitation, a legislature, under our system, may expatiate through the whole domain of the expedient, as fully as the sovereign itself could do, were it to act in person. The propriety of such an adjustment of powers is apparent from the consideration, that whatever is expedient to be done, within the limits imposed by the fundamental law, and whatever, therefore, it may presume the sovereign, in the case supposed, would order to be done, some agency, in all governments pretending to be adequate to perpetuate their own existence, must have authority to do. The formation and establishment of the fundamental law is, in all the American Constitutions, regularly the work of Conventions acting in conjunction with the electors. On the other hand, no fact is better settled than that, beyond the province thus specially set apart for them, neither Conventions nor the bodies of electors have any legislative power. They can neither of them pass any law comprised within the sphere of ordinary legislation." Jameson, Const. Conventions (4th ed.) 359.

In *State* v. *Cox* (1848), 3 Eng. (Ark.) 436, 443, in a dis-

cussion of the powers of a legislature, it was said: ''Among the general powers of the legislative department, is

4. that of passing any law not inconsistent with the Constitution of the United States or of the state. * * *

The General Assembly, in amending the constitution, does not act in the exercise of its ordinary legislative authority of its general powers; but it possesses and acts in the character and capacity of a convention, and is, *quoad hoc,* a convention expressing the supreme will of the sovereign people.'' This language of the Supreme Court of Arkansas meets the approval of the author in Jameson, Const. Conventions (4th ed.) 586, where it is said: ''It expresses with admirable brevity, force, and clearness, the true doctrine in regard to the power of our General Assemblies under similar clauses of our Constitutions.''

In *Eason* v. *State* (1851), 6 Eng. (Ark.) 481, the case of *State* v. *Cox, supra,* was reviewed, and the conclusion there reached, that the legislature, not under its general grant of authority, but under the special grant of power over amendments to the constitution, might amend a section of the bill of rights, was denied. In the latter case, however, it was held that no power was in the possession of the legislature to repeal or change any provision of the bill of rights, ''when acting either in the exercise of ordinary legislative authority, or in the exercise of the higher power specifically granted,'' to participate in the amendment of the constitution; and that such change could only be made by the people through the agency of a convention.

In *City of Chicago* v. *Reeves* (1906), 220 Ill. 274, 77 N. E. 237, it is said on page 288: ''The right to propose amendments to the constitution is not the exercise of legislative power by the General Assembly in its ordinary sense, but such power is vested in the legislature only by the grant found in the constitution, and such power must be exercised within the terms of the grant.''

In *Oakland Pav. Co.* v. *Hilton* (1886), 69 Cal. 479, 514, 11

Pac. 3, we find the following expression of the supreme court of California: "It should be remembered that the legislature, in proposing amendments to the constitution, is not exercising legislative power. Such is the ruling of this court in *Hatch* v. *Stoneman* [1885], 66 Cal. 632 [6 Pac. 734], where it is held that the governor has nothing to do with such proposals. The power given to the legislature is a grant of power. It has it not without the constitutional provision. The grant is given to be exercised in the mode conferred on the legislature by the constitution. It is so limited by the people acting in the exercise of their highest sovereign power. In such case, the mode is the measure of the power. Its action outside of the mode prescribed is as much a nullity as that of a board of supervisors of a city outside of the statute defining its power in regard to the grading of a street. The rule forcibly stated by Justice Coleridge in *Christie* v. *Unwin* [1840], 3 Perry & D. 208, as applicable to powers conferred by statute, is just as applicable here, for the constitutional provision is a statute ordained by a people as part of its paramount law. 'However high the authority,' says the learned Justice, in the case just cited, 'to whom special statutory power is delegated, we must take care that in the exercise of it, the facts giving jurisdiction plainly appear, and that the terms of the statute are complied with. This rule applies equally to an order of the lord chancellor as to any order of petty sessions.' The legislature, acting outside of the constitution, is without jurisdiction and its action null.''

In a later decision of that court, in the case of *Livermore* v. *Waite* (1894), 102 Cal. 113, 36 Pac. 424, 25 L. R. A. 312, it was held that the power of the legislature to initiate any change in the existing organic law was a delegated power to be strictly construed, under the limitations by which it was conferred, and that it was not authorized to assume the functions of a constitutional convention. It was said: "In submitting propositions for the amendment of the constitution,

the legislature is not in the exercise of its legislative power, or of any sovereignty of the people that has been intrusted to it, but is merely acting under a limited power conferred upon it by the people. * * * The extent of this power is limited to the object for which it is given, and is measured by the terms in which it has been conferred, and cannot be extended by the legislature to any other object, or enlarged beyond these terms."

In *Holmberg* v. *Jones* (1901), 7 Idaho 752, 65 Pac. 563, it was said by the supreme court of Idaho: "The power to propose amendments has been granted by the people to the legislature. While the power of the legislature to enact laws is inherent, so far as legislative enactment is concerned, yet the power to propose amendments to the constitution is not inherent. The power to make constitutions and to amend them is inherent, not in the legislature, but in the people."

The supreme court of Missouri, in the case of *Edwards* v. *Lesueur* (1896), 132 Mo. 410, 33 S. W. 1130, 31 L. R. A. 815, which was a suit to enjoin the secretary of state from discharging his duties in relation to the submission of constitutional amendments claimed to be invalid, said on page 433: "It is true the general assembly can only propose amendments under the power delegated to it by the people. This power must be construed according to the general principles which govern courts in the construction of delegated powers. In the exercise of such power every substantial requirement must be observed and followed or there can be no valid amendment. In respect to the mode of proposal and submission, the provisions of the constitution must be regarded as absolute. The courts should not hesitate to see that the constitution is obeyed in these particulars." And again on page 441: "The general assembly in proposing amendments does not, strictly speaking, exercise ordinary legislative power. It acts in behalf of the people of the state under an express and independent power. The mode of its exercise is prescribed and must be observed."

In the case of *Commonwealth, ex rel.,* v. *Griest* (1900), 196 Pa. St. 396, 46 Atl. 505, 50 L. R. A. 568, the supreme court of Pennsylvania directed a writ of mandamus to issue to compel the secretary of state to perform his statutory duties in submitting an amendment which he had refused to discharge because the governor had vetoed the amendment, and the court held that neither veto nor signing by the governor could affect such proposed amendment; as amending the constitution was not lawmaking. It was said that the article of their constitution, similar to ours, which vested generally the legislative authority in the General Assembly, did not cover fundamental legislation. But it was said: "On the contrary the entire article is confined exclusively to the subject of legislation, that is the actual exercise of the lawmaking power of the commonwealth in its ordinary acceptation." And it was said of the provision which empowered the legislature to frame and submit amendments of the constitution: "It is constitution making, it is a concentration of all the power of the people in establishing organic law for the commonwealth. * * * It is not lawmaking, which is a distinct and separate function, but it is a specific exercise of the power of a people to make its constitution."

The same coercive writ was issued to compel the governor of Maryland to discharge a duty placed on him to order publication of proposed amendments as a preliminary requirement to their submission to the voters, which he refused to discharge, because, he claimed, they were inoperative for not having been submitted to him for approval. It was held by the supreme court of that state that a proposal to make a change in the organic law was not legislation in the ordinary sense, and that it was not necessary to submit it to the governor for any action. *Warfield* v. *Vandiver* (1905), 101 Md. 78, 60 Atl. 538, 4 Ann. Cas. 692.

The supreme court of Nebraska in *In re Senate File 31* (1889), 25 Neb. 864, 41 N. W. 981, said: "It will be conceded that under our constitution it is unnecessary to submit

a proposition to amend the constitution, duly passed by each branch of the legislature, to the governor for his approval, as such proposition is not ordinary legislation.''

In the Massachusetts Convention of 1820, Mr. Webster and Mr. Lincoln took the position that conferring the power on the legislature to prepare and propose amendments to the constitution was not giving authority to exercise legislative power in the ordinary sense; the former saying: ''This was not an exercise of legislative power—it was only referring to some branch of the power of making propositions to the people.'' While the words of the latter were: ''The proposing of amendments was not a subject of legislation.'' Deb. Mass. Conv. 1820, pp. 405, 407.

Quoting again from Jameson, in differentiating the functions of legislatures and conventions with relation to the species of law over which they have power, he says: ''Of these two species of law, the distinction between which has been already explained, it is the important thing to note, that the one denominated fundamental is, generally speaking, the work only of a Convention, a special and extraordinary assembly, convening at no regularly recurring periods, but whenever the harvest of constitutional reforms has become ripe; while, on the other hand, the ordinary statute law, whose provisions are tentatory and transient, is, regularly at least, the work of a legislature,—a body meeting periodically at short intervals of time. It is thoroughly settled that, under our Constitutions, State and Federal, a legislature cannot exercise the functions of a Convention,—cannot, in other words, take upon itself the duty of framing, amending, or suspending the operation of the fundamental law.'' Jameson, Const. Conventions (4th ed.) 422. And again, he says on page 211: ''Whenever a Constitution needs a general revision, a Convention is indispensably necessary.'' And in consonance with the principle that legislatures in their ordinary legislative capacity are not competent to frame or draft organic law are these words of Cooley: ''In accord-

Ellingham *v.* Dye—178 Ind. 336.

ance with universal practice, and from the very necessity of the case, amendments to an existing constitution, or entire revisions of it, must be prepared and matured by some *body of representatives chosen for the purpose.*" Cooley, Const. Lim. 61. Where authority is specifically granted to the legislature by the constitution to prepare and submit amendments, that establishes its competency, and, to the extent of the specific authorization and within its limitation, it is always to be considered as chosen for the purpose.

Many of the constitutions, made and ordained in the early days of written constitutions in our country, were silent on the question of future changes, and we are informed by Jameson as follows: "But silence upon a subject of such importance was liable to misconstruction, and was therefore dangerous. Hence the policy of regulating by express constitutional provisions the exercise of so important a power soon began to be generally apparent. In several of the States the clauses of the Constitutions relating to amendments have been couched in negative terms, interdicting amendments except in the cases and modes prescribed. In a majority of the cases, however, they have been permissive, pointing out modes in which Conventions may be called, or specific amendments effected, without terms of restriction, or allusion to other possible modes. But however liberal these provisions may seem to be, restriction is really the policy and the law of the country. By the common law of America, originating with the system we are considering, and out of the same necessities which gave the latter birth, it is settled, that amendments to our Constitutions are to be made only in modes pointed out or sanctioned by the legislative authority, the legal exponent of the will of the majority, which alone is entitled to the force of law. The mode usually employed is that of summoning a Convention; and it is clear that no means are legitimate for the purpose indicated but Conventions, unless employed under an express warrant of

the Constitution. The idea of the people thus restricting themselves in making changes in their Constitutions is original, and is one of the most signal evidences that amongst us liberty means, not the giving of rein to passion or to thoughtless impulse, but the exercise of power by the people for the general good, and, therefore, always under the restraints of law. But, while the framers of our Constitutions have sought to avoid the dangers attending a too frequent change of their fundamental codes, they have adverted to an opposite danger, to be equally shunned—that of making amendments too difficult. With a view to obviate this danger, in all our late Constitutions there have been inserted special provisions, the tenor of which will be explained hereafter. The general principle governing their selection, and, in truth, lying at the foundation of the whole subject, as a branch of practical politics, is this: Provisions regulating the time and mode of effecting organic changes are in the nature of safety-valves,—they must not be so adjusted as to discharge their peculiar function with too great facility, lest they become the ordinary escape-pipes of party passion; nor, on the other hand, must they discharge it with such difficulty that the force needed to induce action is sufficient also to explode the machine. Hence the problem of the Constitution-maker is, in this particular, one of the most difficult in our whole system, to reconcile the requisites for progress with the requisites for safety. This problem cannot be yet regarded as solved, though we are doubtless approximating to a solution. Every new Constitution gathers up the fruits of past experience, and in turn contributes something to the common stock. We have reached such a stage that the provisions of our latest Constitutions may be considered as adequate to all ordinary exigencies of our condition. No community of American citizens would be badly provided for, were it compelled to accept any one of a score of Constitutions now in force amongst us, without modification, save in subordinate particulars touching local matters.'' Jameson, Const. Con-

ventions (4th ed.) 548-550. The author's conclusion is, that the change or amendment of the written constitutions which prevail under the American system is confined to two modes: (1) By the agency of conventions called by the general assembly in obedience to a vote of the people, and usually pursued when a general revision is desired; and (2) through the agency of the specific power granted to the General assembly by constitutional provision to frame and submit proposed amendments, which is considered preferable, when no extensive change in the organic law is proposed. And, it is scarcely necessary to add, the proposed fundamental law must be regularly ratified by the people. Jameson, Const. Conventions (4th ed.) 550, 611, 612.

Accompanying the grant of general legislative authority over the subject-matter of ordinary legislation found in article 4, §1, our Constitution, in article 16, places with the legislature the following special power and duty in relation to fundamental legislation: "Section 1. Any amendment or amendments to this constitution may be proposed in either branch of the general assembly; and if the same shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment or amendments shall, with the yeas and nays thereon, be entered on their journals, and referred to the general assembly to be chosen at the next general election; and if, in the general assembly so next chosen, such proposed amendment or amendments shall be agreed to by a majority of all the members elected to each house, then it shall be the duty of the general assembly to submit such amendment or amendments to the electors of the state; and if a majority of said electors shall ratify the same, such amendment or amendments shall become a part of this constitution.

"Section 2. If two or more amendments shall be submitted at the same time, they shall be submitted in such manner that the electors shall vote for or against each of such amendments separately; and while an amendment or

amendments which shall have been agreed upon by one general assembly shall be awaiting the action of a succeeding general assembly, or of the electors, no additional amendment or amendments shall be proposed.''

The presence of this article in the Constitution fights against the contention that the general grant of legislative authority bears in its broad arms, by implication, any power to formulate and submit proposed organic law, whether in the form of an entire and complete instrument of government to supersede the existing one, or a single amendment. For if the General Assembly has the greater power, unfettered power, under the general grant, what necessity could there have existed for giving the lesser, special power, with the checks and limitations accompanying it? That both the general grant of legislative authority and the special authorization to act in relation to amendments were deemed necessary by the framers of the Constitution arises from the obvious fact that each involved a different subject-matter; the one, of ordinary lawmaking, and the other, the change of organic law. The one involved, necessarily, a broad discretion, while the other merely gave a narrow, limited power, under guard, to aid the people in the exercise of their sovereign power over the structure of their government.

In *Morris* v. *Powell* (1890), 125 Ind. 281, 25 N. E. 221, 9 L. R. A. 326, which involved the validity of a registration law, it was said by Elliott, J., on page 311: ''The question is one of power. If the Constitution authorizes such enactments as those contained in section 13, the power exists, and the section must stand; if the Constitution does not authorize such a law, the power does not exist, and the section must fall. * * * The power which the General Assembly assumed to exercise is not an ordinary legislative power, for, in assuming to legislate upon the subject of the qualifications of voters, that body entered into the domain of those in whom original power resides, and from whom all legislative powers are derived. The people control the subject of the

right of suffrage, and legislative assemblies have only such power over that subject as the people have granted them by the organic law.'' And it may be said, with far greater force, that in assuming to legislate in relation to structural changes in the government, the legislature is not acting within the power it takes under the general grant of authority to enact, alter and repeal laws under and pursuant to the Constitution. For, to deal with organic law—to determine what it shall be, when it needs change, the character of the change and to declare and ordain it—is peculiarly a power belonging to the people, and this fact they have declared, as we have seen, in the first section of the bill of rights.

The constitutional and legislative history of the State bears the strongest witness against the contention that the general grant of legislative authority carries the power to formulate and submit, at will, fundamental law to the people for their action. Power over the Constitution and its change has ever been considered to remain with the people alone, except as they had, in their Constitution, specially delegated powers and duties to the legislative body relative thereto for the aid of the people only. As illustrating the extent and boundaries of the general grant of legislative power in its relation to framing organic law, it is worth while briefly to review those enactments which have given and continued the life of our State.

The act of congress of May 7, 1800, carved out of the Northwest Territory, Indiana Territory, and established a government for it similar to that of the Northwest Territory to begin its existence July 4, 1800. R. S. 1843 p. 28. The ordinance of 1787, providing for the government of the Northwest Territory, provided that the legislative department ''shall have authority to make laws, in all cases for the good government of the district not repugnant to the principles and articles in this ordinance established and declared.'' R. S. 1843 p. 23.

When the embryo state was ready to take its place with the sisterhood of states, there was no assumption that its legislature was competent to form a Constitution for the people of Indiana Territory. On April 19, 1816, congress passed an act to enable the people of Indiana Territory "to form for themselves a Constitution and state government." For this purpose the qualified voters of the territory were authorized to choose representatives to form a convention, which body was authorized to meet at the seat of government on the second Monday of June, 1816, and first determine whether it was expedient at that time to form a Constitution and state government; and it was provided that "if it be determined to be expedient, the convention shall be, and hereby are, authorized to form a constitution and state government * * * provided, that the same, * * * shall be republican, and not repugnant to" the ordinance of 1787. R. S. 1843 p. 33. Obviously it was not thought then that forming a Constitution was included in the power to enact ordinary legislation, or which it was proper to bestow upon a legislative body not specifically selected for that purpose. But it was recognized as a power residing in the people, and to be exercised by them, in the one facile and practical way, through representative agents selected by them for the very purpose. Under this authority and in this mode the people of the territory formed and ordained the first Constitution of the State. R. S. 1843 p. 41. The first section of article 3 of that instrument vested the legislative authority of the new state in the General Assembly, in the same words that the grant was made to it in the existing Constitution. R. S. 1843 p. 44.

In relation to changes in the organic law, article 8 of the Constitution of 1816 provided: "Every twelfth year after this constitution shall have taken effect, at the general election held for governor, there shall be a poll opened, in which the qualified electors of the State, shall express, by vote,

whether they are in favor of calling a convention or not; And if there shall be a majority of all the votes given at such election, in favor of a convention, the Governor shall inform the next General Assembly thereof, whose duty it shall be, to provide by law for the election of the members to the convention, the number thereof, and the time and place of their meeting; which law shall not be passed, unless agreed to by a majority of all the members elected to both branches of the General Assembly; and which convention, when met, shall have the entire power to revise, amend, or change the constitution.'' R. S. 1843 p. 57.

In 1828, pursuant to the foregoing provisions, the legislature submitted to the people the question as to whether or not a constitutional convention should be called. Only ten of the fifty-eight counties in the State appear to have voted upon the question, the total vote being, for a convention, 3,496, against a convention, 6,130. The people, therefore, affirmatively determined that no convention should be called. In 1840, at the end of the next twelve-year period, the question was again submitted to the people, pursuant to the terms of article 8, *supra,* the vote being, for a convention, 12,277, against a convention, 61,721, sixty-nine counties having participated in this vote, fourteen counties making no return thereon. In the face of this vote—five to one against the calling of a constitutional convention—the legislature in 1846, not in accordance with, but independently of the terms of article 8, again submitted the question to the people, at which time the vote resulted, for a convention, 33,175, against a convention, 28,842, in a total of 126,123 votes cast at the election. By recurring to article 8 it will be perceived that in order to authorize the calling of a convention a majority of the votes cast at an election held for the governorship must have been cast in favor of the convention. Inasmuch, therefore, as all the votes cast, both for and against the calling of a convention, in 1846, fell short of a majority

of the votes cast for Governor at that election, the people failed to vote in favor of the calling of a constitutional convention.

Notwithstanding the people had upon these three separate occasions either voted against, or failed to vote by the required majority in favor of calling a convention, the legislature in 1849 again submitted the question for determination (Acts 1849 p. 36) at the annual election in August, 1849, at which the total vote cast for Governor was 149,774 (excluding Fayette county which seems not to have made return of its vote). There was cast in favor of the convention, 81,500 votes, against it, 57,418 votes, showing a majority over all votes cast of 6,612. Pursuant to the authority given by this vote of the people, the General Assembly by an act approved January 18, 1850 (Acts 1850 p. 29), provided "for the call of a Convention of the people of the State of Indiana, to revise, amend, or alter the Constitution of said State." The body selected by the people as provided in that act formed the Constitution, which was submitted to and adopted by the people, and has existed as the organic law, without radical change, for more than sixty years. During the time when these persistent efforts of the General Assembly to get a vote of the people favorable to a revision or amendment of the Constitution by a convention, the obviously concordant opinion of the strong men of the time was that it could only so be made, and be made within the law. Had it been thought then that the general grant of legislative authority placed in the hands of the General Assembly the power to accomplish the same work which that body was asking the people to authorize a constitutional convention to do, it is not to be supposed that the fruitless efforts to secure a convention would have continued. But, on the contrary, it is highly probable that the General Assembly would itself have done the work of revision or reframing amendments, and thus have avoided the delay and the greater expense entailed by a convention. No one then

claimed that the framing of fundamental law might be done
by legislative act under the general grant of legislative au-
thority. Even though the grant to the General Assembly of
special authority to participate to a degree in organic law-
making, and the specific duty of submitting every twelve
years the question of whether the people desired a conven-
tion called, was, as to time, departed from by the General
Assembly in 1846 and in 1849, they still looked to the people,
in whom the right inhered and who alone could put life into
fundamental enactments, for instruction and discretion; and
answering the mandate of the people's vote, they merely
arranged the details for the selection by the people of a body
of representatives for the special duty of drafting a revised
or amended Constitution.

As we have seen, the provision of the existing Constitu-
tion, which vests legislative authority in the General As-
sembly is identical with that of the Constitution of
1816. And if the construction put upon the provi-
sion by the people and the legislative department dur-
ing the thirty-four years under the latter governmental in-
strument, excluded any grant of power to frame a new Con-
stitution, it would seem that such construction was carried
with it into the present Constitution. For, it is a canon of
construction that when the words of a statute, fundamental
or ordinary, are brought forward into a new one, there
comes with it the meaning which it then has. *State* v. *Ens-
ley* (1911), 177 Ind. 483, 97 N. E. 113; 8 Cyc. 739.

Manifestly the framers of the present Constitution and
the people of the State of that time did not understand that
the grant of authority in article 4, §1, empowered the
General Assembly to frame a new Constitution, and
submit it in the manner proposed, in whole or in part.
Had it carried that power in its words, no necessity could
there have been for article 16, which specifically grants
power to the legislature to frame and propose amendments
in a more difficult mode, and so participate with the people

in fundamental enactments. Great and illustrous men were among the membership of the Constitutional Convention of 1850. Men who subsequently occupied the highest offices in the gift of the people of the State, executive and judicial, and who served the State and the Nation in exalted places in the Federal government. But no public service of any of them has proven of greater or more lasting benefit to the people than the organic law which they framed. It is inconceivable that they intended that the general grant of legislative authority should vest in the General Assembly plenary power to draft a new Constitution, and provide for its submission to the people at the same session and in the same Constitution throw around the preparation and submission of a single amendment, the restrictions requiring time for discussion, consideration and deliberation involved in article 16. An examination of the journal and debates of that body shows that provisions were offered by two different members to be embodied in the revised Constitution, which would permit future changes in the Constitution to be framed by the General Assembly and submitted to the people at the ensuing general election, just as it is sought to be done by the act under consideration. That they received little favorable consideration from the convention, appears from the expressed thought, and the action of that body on the subject-matter, which is gathered from its journal and debates.

In the first days of the convention, it appears that Mr. Tague, a member from Hancock county, offered a resolution to amend article 8 of the existing Constitution so as to permit the legislature at any regular session to propose one amendment to be published with the laws and submitted to a vote of the people at the next general election, and if approved by two-thirds of the votes cast, to become a part of the Constitution. Convention Journal 66. Mr. Steele, the member from Wabash county, introduced a resolution, relating to an amendment of the Constitution, reading as follows: "Resolved, that the committee on future amendments to the

Constitution, inquire into the expediency of so amending the Constitution, that hereafter at any time when the citizens of Indiana present to the Legislature a petition or memorial with fifty thousand signers, praying for an amendment to the Constitution, setting forth specifically such amendment, that the Legislature shall provide by law for the said citizens to vote on such proposed amendment, and if adopted, become a part of the Constitution, and be engrafted by the next legislature into the Constitution." Convention Journal 68.

Mr. Frisbie, the member from Perry county, presented a resolution, requiring the same committee to inquire into the expediency of inserting a provision for amendment, substantially as follows: "That whenever the Legislature shall become satisfied that a majority of the people of the State are dissatisfied with any portion of the Constitution, it shall be their duty, by joint resolution or otherwise, to present to the voters of the State, in a distinct form, such proposed change or changes to be acted upon by the voters at the polls at the next general election, and if a majority of all the votes given at such election be given in favor of such change or changes and so made to appear to the next ensuing Legislature, it shall be the duty of the Executive to issue his proclamation declaring said amendment or amendments to be a part and parcel of the Constitution." Convention Journal 69.

Later in the existence of the convention, as we find on page 444 of the journal, Mr. Read, of Clark county, submitted a resolution embodying a proposed article relating to future amendments, which gave power to the legislature to propose amendments if agreed to by two-thirds of the members elected to each house, and approved by the Governor. They were then to be published in at least one newspaper in each county for three months before the next general election, and if the legislature then chosen should approve them by a majority of the members elected to each

house, they were to be again published, and submitted to a vote of the electors and, if ratified by a majority, to become a part of the Constitution. But it also provided that amendments should not be so proposed oftener than once in ten years.

These resolutions all went by reference to the committee on future amendments, and that committee reported to the convention, and recommended for passage by it as a part of the amended Constitution, the following article in two sections: "Section 1. Whenever two-thirds of all the members elected to each branch of the General Assembly shall think it necessary to call a Convention to alter or amend this Constitution, they shall recommend to the electors at the next election of members of the General Assembly to vote for or against a Convention; and if it shall appear that a majority of all the electors of the State voting for representatives have voted for a Convention, the General Assembly shall, at its next session, call a Convention for the purpose of revising, altering or amending this Constitution.

"Section 2. Any amendment or amendments to this Constitution may be proposed in either branch of the General Assembly, and if the same shall be agreed to by two-thirds of all the members elected in each of the two houses, such proposed amendment or amendments shall be referred to the next regular session of the General Assembly, and shall be published at least three months previous to the time of holding the next election for members of the House of Representatives; and if at the next regular session of the General Assembly after said election, a majority of all the members elected in each branch of the General Assembly shall agree to said amendment or amendments, then it shall be their duty to submit the same to the people at the next general election for their adoption or rejection in such manner as may be prescribed by law; and if a majority of all the electors voting at said election for members of the House of Representatives shall vote for such amendment or amend-

ments, the same shall become a part of the Constitution. If two or more amendments be submitted at the same time, they shall be submitted in such manner that the people shall vote for or against each of such amendments separately, and while an amendment or amendments which has been agreed upon by one General Assembly is awaiting the action of a succeeding Assembly, or undergoing the final consideration of the people, no additional amendment or amendments shall be proposed.''

The report of the committee was concurred in, and the article was passed to a second reading. Convention Journal 693. When the article came up on second reading, Mr. Bascom, the member from the district of Adams and Wells counties, unsuccessfully moved to strike out §1 and insert the following: ''Section 1. Every sixteenth year after this Constitution shall have taken effect, at the general election, held for Governor, there shall be a poll opened in which the qualified electors of the State shall express by vote, whether they are in favor of calling a Convention or not; and if there should be a majority of all the votes given at such election, the Governor shall inform the next General Assembly thereof, whose duty it shall be to provide by law for the election of the members to the Convention, the number thereof, and the time and place of their meeting; and which Convention, when met, shall have it in their power to revise, amend or change the Constitution.'' Convention Journal 830. The first section as reported by the committee was then rejected by the convention. Convention Journal 831. The second section being taken up for consideration, Mr. Stevenson, of Putnam county, moved to amend by making a majority vote instead of two-thirds of the members elected in each of the two houses sufficient to pass a proposed amendment. Mr. Owen, of Posey county, moved to amend this by striking out the section and inserting instead the following: ''Section 2. Any amendment or amendments to this Constitution may be proposed in the Senate or House of Representatives; and if

the same shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment or amendments shall be entered on their journals, with the ayes and noes taken thereon and referred to the Legislature to be chosen at the next general election, and if in the Legislature so next chosen, such proposed amendment or amendments shall be agreed to by a majority of all the members elected to each house, then it shall be the duty of the Legislature to submit such amendment or amendments to the qualified electors of the State; and if a majority of said electors shall ratify the same, such amendment or amendments shall become a part of this Constitution.'' Convention Journal 832.

Mr. Newman, a member from Wayne county, moved to amend the amendment offered by Mr. Owen by striking it out and inserting therefor the following: ''The General Assembly may at its first session after six years from the adoption of this Constitution, and every tenth year thereafter, by a vote of three-fifths of each branch thereof recommend to the electors of this State, any alteration or amendment to this Constitution, and provide for submitting any such alteration or amendment to a vote of such electors, and if a majority of such electors shall vote in favor of such alteration or amendment then the same shall be adopted and form a part of this Constitution.'' Mr. Newman's amendment failed and that of Mr. Owen was adopted and engrossed for third reading. Convention Journal 833; Debates of the Convention 1915, 1918.

The second section being taken up on third reading, Mr. Pettit, a member from Tippecanoe county, moved to recommit it, with instructions to strike it out, and insert instead the following: ''No amendment shall be made to this Constitution, unless the same shall be called for and approved by a majority of all the voters of this State.'' Convention Journal 837. Mr. Howe, of LaGrange county, moved to amend this proposal, by adding to it the following: ''And

once in every twelve years after the adoption of this Constitution, the General Assembly may pass an act for the call of a Convention, and if the next General Assembly shall, by a majority vote, adopt the said act, it shall then provide by law for the opening of a poll, in which the qualified electors of the State shall express by vote, whether they are in favor of calling a Convention or not, and if a majority of all the votes given at such election be in favor of calling a Convention, then such Convention shall be called, which Convention shall have the power to revise, amend, or change the Constitution; but no amendment shall be proposed or made, nor shall a Convention be called, otherwise than as in this article expressly provided." Convention Journal 837. Both propositions failed, and the section was not recommitted, but passed and referred to the committee on revision, arrangement and phraseology by a vote of seventy-seven to forty-five. Convention Journal 839. Later, an additional section, proposed by Mr. Ritchey, of Johnson county, the chairman of the committee, was adopted, and it reads as follows: "Section 5. If two or more amendments be submitted at the same time, they shall be submitted in such manner that the people shall vote for or against each of such amendments separately; and while an amendment or amendments which has been agreed upon by one General Assembly is awaiting the action of a succeeding General Assembly, or undergoing the final consideration of the people, no additional amendment or amendments shall be proposed." Convention Journal 841.

The following offered as an additonal section by Mr. Helmer, of Lawrence county, was rejected: "Section 6. Every tenth year after the adoption of this Constitution, at the general election held therein, there shall be a poll opened in which the qualified electors of the State shall express by vote whether they are in favor of calling a Convention or not; and if there should be a majority of all the votes given at such election in favor of a Convention, the Governor shall

inform the next General Assembly thereof, whose duty it shall be to provide by law for the election of the delegates to the Convention, the number thereof, which shall not exceed one from every Senatorial district into which the State is at the time divided, and the time and place of their meeting, which Convention, when met, shall have power to revise, amend, or change the Constitution.'' Convention Journal 842.

The committee on revision, arrangement and phraseology reported back to the convention the provisions for amendment and change of the Constitution, proposed by Mr. Owen and Mr. Ritchey, with slight changes in the phraseology, and they became respectively §§1, 2 of article 16 of the Constitution as it now is. Convention Journal 976.

The debate in the convention, during the consideration of these various methods of providing for change or amendment of the Constitution in the future, is illuminating, and makes clear the purpose of that body, which, by express representative authority, was exercising the sovereignty of the people in amending and revising their fundamental law. Mr. Ritchey, the chairman of the committee, defended its report recommending the two sections. He favored the two methods of making amendments, that, provided by the first section, for calling a convention when general and numerous amendments were contemplated, and the one, provided by the second section, when isolated amendments were deemed desirable. The latter method was to save the greater expense and inconvenience of a convention. He defended the requirement of a vote of two-thirds of the members of the two houses of the legislature, on the ground that it was ''a necessary check upon the too frequent introduction of propositions to change the provisions of the Constitution.'' ''If there is anything that should be held sacred,'' he said, ''and scrupulously guarded against hasty and inconsiderate changes, it is the fundamental law.'' He expressed regret that the convention had rejected the provision embodied in

the first section for amending by convention, and said: "I would prefer, myself, that the people should have the power to call another convention to amend the Constitution."

In advocating the adoption of his proposal above set forth, Mr. Newman expressed his opposition to the frequent changes in the organic law made possible by the proposed §2 of Mr. Owen's proposed amendment of it. He thought that to permit the legislature by a three-fifths vote to propose amendments at intervals of ten years only would insure that a healthy and matured public sentiment on the subject would prevent inconsiderate proposals for amendment. Mr. Owen, in answer, agreed that it was desirable that there should not be too great instability in regard to the Constitution; but he opposed the proposition to attempt to restrict amendments to periods of ten years, which made it too difficult to amend the organic law, and he also opposed the proposition of Mr. Pettit, which infringed stability. He said, among other things: "But I say if you insert such a provision as this, placing no greater check than that of requiring two successive Legislatures to act affirmatively upon the question before it shall be submitted to the people, I am convinced that it will be entirely satisfactory. It is very well known that I am not conservative in my opinions. I believe in progress and advancement in the science of government as well as all other sciences, physical and moral. But while I am willing that changes and amendments should from time to time be made, yet I would not have them made without due consideration. I would have at least the meeting of one Legislature intervening between the time of the first proposing of an amendment and the time of its final adoption. I believe if we adopt the section as it stands, we will have a just medium between the proposition of the gentleman from Tippecanoe, which I hold does not interpose a sufficient check, and the proposition of the gentleman from Lagrange, which I think wholly impracticable." Mr. Kelso, of Ohio and Swit-

zerland counties, and Mr. Steele supported the amendment of Mr. Owen, on the ground that it provided an easy and safe mode of change or amendment. Mr. Pettit advocated leaving the greatest freedom of action to the people in initiating and making changes in the Constitution.

Mr. Howe expressed himself in favor of amendment by convention alone, and then only at periods of twelve years, when the people had voted in favor of such convention. Mr. Rariden, of Wayne, opposed any provision permitting amendment or change oftener than at periods of five years, and favored action by convention as being the most satisfactory. Debates of the Convention 1913-1918, 1938, 1939.

It will be noted that the provision proposed by Mr. Read was, with the exception of the last part of it, which limited the right of the legislature to propose amendments to periods of ten years, similar to the one which subsequently met the approval of the convention, and became a part of the Constitution. In the discussion of it earlier in the convention, it seemed to be agreed that if the Constitution of 1816 had contained a similar provision for amendment by legislative initiation, the convention then being held would have been wholly unnecessary. Mr. Owen agreed that there should be provision for amendments to be proposed by the legislature, and that such proposed amendments should be approved by two successive legislatures, but he opposed that part limiting action to ten-year periods. Mr. Borden of Allen county, expressed his disapproval of this or any proposition to confer upon the legislature any power to frame and submit amendments, and favored, in the interest of stability, amendment by convention alone, to be called only at long intervals, and after a vote of the people favorable to the calling of a convention had been taken. Debates of the Convention 1258, 1260.

What the words of the Constitution of 1851 meant at the time it was framed by the representatives of the people, taking counsel together in convention for the good of the State,

and speaking with their voice, it must mean now to the people, and to all the departments of their government in the hands of their agents. For, as said by the supreme court of Michigan, speaking through Cooley, J.: "Constitutions do not change with the varying tides of public opinion and desire; the will of the people therein recorded is the same inflexible law until changed by their own deliberative action; and it cannot be permissible to the courts that in order to aid evasions and circumventions, they shall subject these instruments,  *  *  *  to a literal and technical construction, as if they were great public enemies standing in the way of progress, and the duty of every good citizen was to get around their provisions whenever practicable, and give them a damaging thrust whenever convenient. They must construe them as the people did in their adoption, if the means of arriving at that construction are within their power." *People, ex rel.,* v. *State Treasurer* (1871), 23 Mich. 499, 506.

There can be little doubt but that the framers of the revised Constitution of 1851 believed that in article 16 they had provided an orderly method for making all the changes in the organic law which might become necessary. If they were conscious of the accomplishment of a good work, they were justified. All the best principles of a representative democracy were declared and guaranteed. Governmental power was divided, and placed in separate agencies, and other checks against the growth of power into absolutism were provided. That progress and growth might require change in some minor respects was recognized, and such change provided for in article 16. It is manifest that they held the views relating to future changes in the organic law which influenced the convention of Massachusetts of 1820, of which Daniel Webster was a member, and the chairman of the committee on future amendments, which reported in favor of the legislative mode of proposing amendments under guards and restrictions, and inserted no provision for

calling a convention. In explaining the reason for the action, Mr. Webster said: "It occurred to the committee that, with the experience which we had had of the Constitution, there was little probability that, after the amendments which should now be adopted, there would ever be any occasion for great changes. No revision of its general principles would be necessary, and the alterations which should be called for by a change of circumstances would be limited and specific. It was, therefore, the opinion of the committee that no provision for a revision of the whole Constitution was expedient, and the only question was in what manner it should be provided that particular amendments might be obtained. It was a natural course, and conformable to analogy and precedent in some degree, that every proposition for amendment should originate in the legislature under certain guards and be sent out to the people." Deb. Mass. Conv. 1820 pp. 413, 414. Another thing is clearly disclosed by the review given of the proceedings of the convention on this subject, and that is, that it was the judgment of that body that an easy and wholly adequate method of making needed changes in the Constitution had been provided. Evidently, individual members thought it too easy.

In years, it came about that there was the pressing need and demand for changes in the Constitution, which progress and growth bring, in some particulars relating to the time of holding elections, the qualifications of voters, courts, the indebtedness of cities, fees and salaries of public officers, and other matters. The legislature of 1877, under the power conferred by article 16, framed seven different amendments, and referred them to the next General Assembly, which performed its function in accordance with the constitutional authorization, and submitted them to the people for adoption. Acts 1879 p. 25. They received a majority of the votes cast on them, but not a majority of all the votes cast at the election. A question arose over their adoption, and the case of *Swift* v. *State* (1880), 69 Ind. 505 pre-

sented that question to this court for determination. It was held, that not having received a majority of all the votes cast at the election in which they were voted on, they had failed of adoption. It is a part of the history of the State that the matter of the failure of the ratification of the proposed amendments was widely and well considered and discussed during the period preceding the ensuing general election, so that the public mind was involved in a study and consideration of fundamental legislation. Subsequently, the General Assembly of 1881 again provided for the submission of these amendments at a special election, and they were ratified, and became a part of the organic law of the State.

Again, in 1903, the legislature, acting under the provisions of article 16, initiated a proposed amendment to vest in the legislature authority to fix the qualifications for admission to the bar, and the General Assembly at the ensuing session in 1905 approved the action, and provided for the submission of the proposed amendment at the general election in 1906. It received a majority of the votes cast on it, but not a majority of the votes cast at the election, and failed of adoption. Once again the General Assembly, at its session in 1909, referred this amendment to the will of the voters at the general election in 1910, and once more it received a majority of the votes cast thereon, but not a majority of the votes cast at the election. And so it has been assumed that it stands obstructive of further proposals for amendment, by reason of the provision of article 16, §2, while waiting definitive action by the people. During all the time that has witnessed difficulties in securing consummation of amendments to the Constitution in the mode allowed and provided by that instrument, no suggestion has come from any citizen, skilled in the science of government or not, that the General Assembly possessed the power, under the general grant of legislative authority, to frame amendments into the existing Constitution, and submit them as a new

Constitution, as now proposed. Nor has the claim ever been advanced, that the legislature had power to draft and submit proposed organic law, other than that specifically given by article 16.

This contemporaneous construction, which has persisted for nearly a century, speaks loudly in harmony with reason and the sound principles of representative democracy against the possession of the power claimed. The assertion of the power by the General Assembly of 1911 was not born of any grant to the legislative department, either expressly, generally or by any implication which is permissible. But by taking cognizance of the history of the time, we know that amendments, which have been proposed in the orderly way by the General Assembly under constitutional direction, have failed of adoption, not through any defect in the mode provided by the Constitution for making the amendments, but through an indifference or lack of interest on the part of the people themselves in the proposed change, or through a failure of the legislature to place them before the people for ratification at a special election, where their interest would not be alienated by the other interests involved in a general election. And we are asked to raise the power from the general legislative authority by implication, to serve convenience and expedition in making organic change. If it were conceded that an easier and quicker mode of change is desirable, a concession not permissible, if the views of the greatest writers on questions touching government under written constitutions are of force, a canon of constitutional construction forbids the implication of the authority, for it is the rule that where the means by which the power granted shall be exercised are specified, no other or different means for the exercise of of such power can be implied, even though considered more convenient or effective than the means given in the Constitution; and the Constitution gives special power to the legislature, and provides the means of exercising it, to effect

needed changes in the organic law. Should the General As-
sembly ignore the provisions of the Constitution in relation
to drafting and submitting amendments, and at one session
frame one or twenty proposed amendments, and provide for
the submission at the next following general election, it
would be clear, beyond all contention, that it would be act-
ing without power, and the act providing for the submission
a mere nullity. How can it be possible, then, that it can at
one session incorporate the changes, twenty-three in number,
in a copy of the existing Constitution, designate its work a
"proposed new Constitution", and incorporate it in a bill,
sending it to the people at the next ensuing general election
for their adoption or rejection, as it is sought to do by chap-
ter 118? The power cannot inhere in the General Assembly
to do the latter, if not the former. To grant the contention of
appellants' learned counsel would be to concede that a Gen-
eral Assembly was clothed with power to draft an amend-
ment or a new Constitution, and, in the first days of its ses-
sion to pass an act submitting it to the people at a special
election in thirty days or ten days; and if it received the
approval of a majority of those voting at the election,
though a small minority of the voters of the State, ordain it
as organic law before the end of the session. This possibility
illustrates baldly, at once, the unsoundness of the conten-
tion, and the wisdom of the framers of the Constitution in
guarding changes of that instrument. The great men who
builded the structure of our State in this respect had the
mental vision of a good Constitution, voiced by Judge
Cooley, who has said: "A good Constitution should be be-
yond the reach of temporary excitement and popular caprice
or passion. It is needed for stability and steadiness; it
must yield to the thought of the people; not to the whim of
the people, or the thought involved in excitement or hot
blood, but the sober second thought, which alone, if the gov-
ernment is to be safe, can be allowed efficiency. * * *
Changes in government are to be feared unless the benefit is

certain. As Montaign says: 'All great mutations shake and disorder a state. Good does not necessarily succeed evil; another evil may succeed, and a worse.' " Am. Law Rev. 1889 p. 311.

It was the thought of the people, the sober second thought, that the framers of our Constitution invoked by the provision which they inserted for amendment and change; and for this, in the people and their representatives as well, they provided for the delay embodied in article 16, for that discussion and consideration which would bring it forth. They knew the truth expressed by Professor Lieber, that an election which takes place to decide on the adoption or rejection of a fundamental law can have no permanent value whatever unless the question has been fairly before the people for a period sufficiently long to discuss the matter thoroughly, and under circumstances to allow a free discussion. Civil Liberty and Self Government 414.

The question is one of power to *draft* organic law.

7. Of such power the legislature has only that measure expressly granted to it by the people speaking through the Constitution; and that is to be exercised strictly in the mode provided.

The proposed "new Constitution," incorporated in chapter 118 for submission, carries in its terms a confession, if not a lack of power in the General Assembly to formulate and submit it, surely of the unwisdom of the practice, for in that part of its provisions devoted to future changes, the following is found: "No new Constitution shall be submitted to the electors of this state for ratification and adoption or rejection, until by virtue of an act of the general assembly, a majority of the legal voters of the State have declared in favor of a constitutional convention; when and whereupon, such constitutional convention shall be convened in such manner as the general assembly may provide, but any constitution by such convention proposed shall be submitted to the voters of this state for ratification or rejection

at a special election as may be ordered by the general assembly.'' Acts 1911 p. 240.

The learned counsel for appellants contend that no restrictions upon the making of a new Constitution are imposed by the present Constitution, and it is insisted that the action of the legislature in the submission to the people in 1846, 1847 and 1849, at times not specifically authorized by the Constitution of 1816, of the question whether they desired a convention called to revise or amend the existing Constitution, furnished a clear precedent for the action of the General Assembly of 1911. To neither contention does our judgment compel or permit assent. As to the first, we have seen the general grant of legislative authority does not include the formulation of organic law; and we look for no restrictions in that grant, upon the matter of Constitution making, for that is a power inhering in the people, as declared, as we have seen, in the first article of the Constitution. ''Prohibitions are only important where they are in the nature of exceptions to a general grant of power; and if the authority to do an act has not been granted by the sovereign to its representative, it cannot be necessary to prohibit its being done.'' Cooley, Const. Lim. 243. And again we find in the same work on page 245 the following: ''And however proper and prudent it may be expressly to prohibit those things which are not understood to be within the proper attributes of legislative power, such prohibition can never be regarded as essential, when the extent of the power apportioned to the legislative department is found upon examination not to be broad enough to cover the obnoxious authority. The absence of such prohibition cannot, by implication, confer power.'' To the second contention, it may be answered, that the General Assembly, in the action taken in those years, made no attempt to assume the power, under the general grant of authority to legislate, to formulate a new Constitution, or to revise the existing one. It merely asked the people to express their will in relation to calling

a convention to revise or amend the Constitution, to be expressed through the ballot, and when it was expressed it was a warrant and a command which the legislative agency carried out as given. Under such circumstances, the calling of a convention, as Jameson in his work shows, is in accordance with sound political principles, and a well-recognized and established practice. The rule thus established in American constitutional law by the evolution of the constitutional convention from the two revolutionary conventions of England in 1666 and 1689, he shows is applicable to states like ours, having a limited provision for amendment, through the initiative of the legislature, but no provision for a convention for a general revision. But we know of no authority, and counsel have exhibited none to us, to the effect that when the government of a state has been instituted under a written constitution, delegating powers to agents, with limitations and checks thereon, the legislature takes plenary power at will, under its general grant of legislative authority, to prepare and submit to the people proposed organic law. The formation of constitutions in the revolutionary and reconstruction periods of our history, and instances such as that involved in the case of *Brittle* v. *Peopl:* (1873), 2 Neb. 198, which involved the validity of a constitution submitted to the people by the territorial legislature, and by which the state government was instituted, are obviously distinguishable. There existed in Nebraska at the time of the decision of that case no state constitution to designate the legislative authority or limit its exercise. By the institution of government under a written constitution the people have bound, not alone their agents, but themselves as well, until that instrument is changed by orderly method; and of these the two exist—the convention, where extensive amendment or revision is desired, and the specifically-granted legislative mode, when few and comparatively simple amendments are deemed desirable. As said by the supreme court of Pennsylvania, in *Woods's Appeal* (1874),

75 Pa. St. 59: "No argument for the implied power of absolute sovereignty in a convention can be drawn from revolutionary times, when necessity begets a new government. Governments thus accepted and ratified by silent submission afford no precedents for the power of a convention in a time of profound tranquillity, and for a people living under self-established, safe institutions."

It would not be practicable, if possible, in a written constitution, to specify in detail all its objects and purposes, or the means by which they are to be carried into effect. Such prolixity in a code designed as a frame of government has never been considered necessary nor desirable. Therefore, constitutional powers are often granted or restrained in general terms, from which implied powers and restraints may necessarily arise. It is an established rule of 8. construction, that where a constitution confers a power or enjoins a duty, it also confers, by implication, all powers that are necessary for the exercise of the one, or for the performance of the other. But this rule cannot serve to admit, by implication, within the scope of ordinary legislative authority, the extraordinary power to participate in constitution making, by framing and submitting a new constitution. Moreover, this rule of construction is coupled with another equally well established, the one above referred to, that where the means by which a power granted shall be exercised are specified, no other or different means for the exercise of the power can be implied, even though considered more convenient or effective than the means given in the constitution. 8 Cyc. 742. The thing attempted to be done by the General Assembly is merely to prepare and propose changes in the organic law, and submit their work to the people in a quicker and easier way than that provided by the express provision, and the fact that it takes the form of a complete constitution cannot prevent the application of the rule.

We think it has been made to appear, indeed, that by the

very strongest implication the power claimed is denied the legislature, and not given to it. We have seen that

1. the intent of the framers, and the spirit which entered into article 16 when it was prepared and agreed to by the representatives of the people in the business of constitution making in the convention of 1850, were directly against such action as that taken by the General Assembly, and in such case the words of the highest court of New York are applicable: "A written constitution must be interpreted and effect given to it as the paramount law of the land, equally obligatory upon the legislature as upon other departments of government and individual citizens, according to its spirit and the intent of its framers, as indicated by its terms." *People, ex rel.,* v. *Albertson* (1873), 55 N. Y. 50, 55.

"We must not forget that a constitution is the measure of the rights delegated by the people to their governmental agents and not of the rights of the people. * * * The implied restraints of the constitution upon legislative power may be as effectual for its condemnation as the written words, and such restraints may be found either in the language employed, or in the evident purpose which was in view and the circumstances and historical events which led to the enactment of the particular provision as a part of the organic law." *Rathbone* v. *Wirth* (1896), 150 N. Y. 459, 470, 483, 45 N. E. 15, 34 L. R. A. 408.

If the power to draft and submit to the people organic law is embraced in the broad bestowal of "the legislative authority of the State," made in article 4, §1, where is the limitation on it, save that of the Constitution of the United States? What check is laid upon the use of the power? There is none, for all the checks and limitations which the people in their Constitution have placed upon the legislature are upon the exercise of the power over ordinary legislation, and have no relation to fundamental legislation. The legislature being supreme and sovereign in the exercise of the

legislative authority, save only as it is limited by the Constitution of the United States, the laws and treaties made under it, and the limitations stated in our state Constitution, if its general authority includes the subject-matter of organic legislation, why submit the "new Constitution" to the people at all? For the Federal Constitution or laws do not prohibit doing so, and no limitation is found in article 4 of our own Constitution, which places a ban upon the action.

It must be remembered that the Constitution is the people's enactment. No proposed change can become effective unless they will it so through the compelling force of need of it and desire for it. We have not heard the voice of the people raised in a demand for a new Constitution. And so we doubt if there is reason for applying the doctrine of construction *ab inconvenienti* to the existing Constitution to hurry to the people organic change which they have not called for. That the Constitution may need amendment, may be true. But there has never been a time when the people might not, if they pleased and if they had believed it necessary, have made any change desired in the orderly ways provided. That they have not done so, and that the General Assembly may believe good will follow by deviating from the slow and orderly processes, will not justify a construction of the Constitution which does violence to its intent and express provisions.

In Cooley, Const. Lim. (7th ed.) 107, note, it is said: "We agree with the Supreme Court of Indiana, that, in construing constitutions, courts have nothing to do with the argument *ab inconvenienti,* and should not 'bend the Constitution to suit the law of the hour;' *Greencastle Township* v. *Black* [1854], 5 Ind. 557, 565; and with Bronson, Ch. J., in what he says in *Oakley* v. *Aspinwall* [1850], 3 N. Y. 547, 568: 'It is highly probable that inconveniences will result from following the Constitution as it is written. But that consideration can have no force with me. It is not for us,

but for those who made the instrument, to supply its defects. If the legislature or the courts may take that office upon themselves, or if, under color of construction, or upon any other specious ground, they may depart from that which is plainly declared, the people may well despair of ever being able to set any boundary to the powers of the government. Written constitutions will be more than useless. Believing as I do that the success of free institutions depends upon a rigid adherence to the fundamental law, I have never yielded to considerations of expediency in expounding it. There is always some plausible reason for latitudinarian constructions which are resorted to for the purpose of acquiring power; some evil to be avoided or some good to be attained by pushing the powers of the government beyond their legitimate boundary. It is by yielding to such influences that constitutions are gradually undermined and finally overthrown. My rule has ever been to follow the fundamental law as it is written, regardless of consequences. If the law does not work well, the people can amend it; and inconveniences can be borne long enough to await that process. But if the legislature or the courts undertake to cure defects by forced and unnatural constructions, they inflict a wound upon the Constitution which nothing can heal. One step taken by the legislature or the judiciary, in enlarging the powers of the government, opens the door for another which will be sure to follow; and so the process goes on until all respect for the fundamental law is lost, and the powers of the government are just what those in authority please to call them.' "

The sound rule which, as we have seen, is approved by Mr. Jameson, and which must be applied to the determination of the question, is well stated in 6 Am. and Eng. Ency. Law (2d ed.) 902, as follows: "The proposal of amendments to the constitution is not a power inherent in the legislative department, but must be conferred by a special grant of the constitution, and in the absence of such a pro-

vision the legislature has no capacity thus to initiate amendments. On the other hand, long-established usage has settled the principle that a general grant of legislative power carries with it the authority to call conventions for the amendment, or revision of the constitution; and even where the only method provided in the constitution for its own modification is by legislative submission of amendments, the better doctrine seems to be that such provision, unless in terms restrictive, is permissive only, and does not preclude the calling of a constitutional convention under the implied powers of the legislative department.''

It is the contention of appellants' counsel that the present Constitution provides how amendments *may* be made, but does not prescribe how they *shall* be made; and that,

7. therefore, if Chapter 118 (Acts 1911, *supra*) shall be considered as an attempt to propose amendments to the organic law, the provisions of article 16 are not violated. As we have seen, no pretense was made of complying with the provisions of §1 of the article, requiring amendments to be passed upon by two General Assemblies, and entering the proposed change upon the journals, together with the yeas and nays. The rules of constitutional interpretation above referred to apply with compelling force to overthrow this contention. And judicial and commentatorial utterance on the precise question is overwhelmingly against the contention. Jameson states the rule as follows: ''In a previous section it was said, that the power given to a legislature to propose to the people amendments to the Constitution is not an incident to the general grant of legislative power, but, if it exist at all, rests upon some special constitutional provision; in other words, that it is a statutory power. From this it follows that, like all statutory powers, it must be strictly pursued. So far there has been little or no controversy.'' Jameson, Const. Conventions (4th ed.) 615.

The rule is sustained by *State* v. *Swift* (1880), 69 Ind.

505, in which this court declared on page 519 in the opinion of the court by Biddle, C. J., who was a member of the constitutional convention of 1850-51: "The people of a State may form an original constitution, or abrogate an old one and form a new one, at any time, without any political restriction except the constitution of the United States; but if they undertake to add an amendment, by the authority of legislation, to a constitution already in existence, they can do it only by the method pointed out by the constitution to which the amendment is to be added. The power to amend a constitution by legislative action does not confer the power to break it, any more than it confers the power to legislate on any other subject, contrary to its prohibitions."

And again, in the opinion of this court in the case entitled, *In re Denny* (1901), 156 Ind. 104, 59 N. E. 359, 51 L. R. A. 722, it was said by Baker, J., who spoke for the court: "It is only by virtue of the Constitution's command to that body that the proposed amendment may be submitted by legislative act." *State* v. *McBride* (1836), 4 Mo. 303, 29 Am. Dec. 636; *Collier* v. *Frierson* (1854), 24 Ala. 100; *Koehler & Lange* v. *Hill* (1883), 60 Iowa 543, 14 N. W. 730, 15 N. W. 609; *State, ex rel.,* v. *Tufly* (1887), 19 Nev. 391, 12 Pac. 835, 3 Am. St. 895; *State, ex rel.,* v. *Timme* (1882), 54 Wis. 318, 11 N. W. 785; *Opinion of Judges* (1850), 6 Cush. (Mass.) 573; *Kadderly* v. *Portland* (1903), 44 Or. 118, 74 Pac. 710, 75 Pac. 222; *McBee* v. *Brady* (1909), 15 Idaho 761, 100 Pac. 97; *Trustees, etc.,* v. *McIver* (1875), 72 N. C. 76; 6 Am. and Eng. Ency. Law 902-904; 8 Cyc. 719. See, also, many of the cases cited hereinafter in this opinion in considering the question of jurisdiction.

One of the latest expressions of the rule by the courts of the country relating to amendment and change of constitutions by the legislative mode, is the following from *McBee* v. *Brady, supra,* on page 775: "The constitution is the fundamental law of the state. It received its force from the

express will of the people, and in expressing that will the people have incorporated therein the method and manner by which the same can be amended and changed, and when the electors of the state have incorporated into the fundamental law the particular manner in which the same may be altered or changed, then any course which disregards that express will is a direct violation of that. fundamental law.'' A law that is unconstitutional is so because it is either an assumption of power not legislative in its nature, or, because it is inconsistent with some provisions of the Federal or State Constitution. *Commonwealth* v. *Maxwell* (1856), 27 Pa. St. 444.

Sound legal and political principles, the history of our political life as a State, and the authority of judicial and commentatorial opinion, all unite in forcing the conclusion that the act of 1911, *supra,* is invalid for want of power in the General Assembly to draft an entire Constitution, and forthwith submit it to the people under its general legislative authority if the instrument be conceded to be a new Constitution, and not merely amendments; and that if it be considered as merely a series of amendments, it is a palpable evasion and disregard of the requirements and checks of article 16, and is, for that reason, void. This conclusion renders unnecessary any consideration of the other objections raised against the validity of the act.

But counsel for appellants, with great earnestness and signal ability, both in argument and briefs, insist that this court is without jurisdiction to determine this question. Since the lucid exposition of the power of courts to declare an act of legislation void, when in excess of the power of the legislature, or in conflict with some express provision of the Constitution, which was given by Chief Justice Marshall, in *Marbury* v. *Madison* (1803), 1 Cranch 137, 2 L. Ed. 60, the existence of the power in the

courts has never been denied. Nor, since that decision, until of late, has the wisdom of so placing the power been questioned as a necessary political principle in governments under written constitutions. The power had been exercised in prior cases, but had not before been authoritatively declared to exist. 1 Thayer, Cases on Const. Law 48,107; Marshall, Comp. Const. Dec. 39. In a Marshall commemorative address, delivered before the state bar association in 1901 (1 Marshall Memorial 345, 361), John F. Dillon, the distinguished jurist and author, said of it: ."The case also decided for the first time in the Supreme Court of the United States that an act of Congress repugnant to the constitution is void—observe, not voidable, but *void*—and that it is not only within the power, but it is also the duty, of the judicial department so to decide in any case properly before it involving the question. It is this point affirming the power and duty of the court to adjudge the laws in conflict with the constitution to be void that gives to that opinion, which has become the corner-stone of the constitutional law of this country, its vital and transcendant importance." Professor Parsons, in commenting on the case, said in an address, found in Am. Law Review, 1865 p. 432, and in Marshall, Comp. Const. Dec. 37, said: "I should not do justice to my own deliberate belief did I not say that I think this decision is not surpassed in the ability it displays, nor equalled in its utility, by any case in the multitudinous records of English or American jurisprudence." Chancellor Kent's approval of the decision is as follows: "This great question may be regarded as now finally settled, and I consider it to be one of the most interesting points in favor of constitutional liberty and of the security of property in this country that has ever been judicially determined. In Marbury against Madison this subject was brought under the consideration of the Supreme Court of the United States and received a clear and elaborate discussion. The power and duty of the judiciary

to disregard an unconstitutional act of Congress, or of any State Legislature, were declared in an argument approaching to the precision and certainty of a mathematical demonstration." 1 Kent's Comm. 453, 454. And the following are the words of that great American lawyer, Rufus Choate: "I do not know that I can point to one achievement in American statesmanship which can take rank for its consequences of good above that single decision of the Supreme Court which adjudged that an act of the Legislature contrary to the Constitution is void, and that the judicial department is clothed with the power to ascertain the repugnancy and pronounce the legal conclusion. That the framers of the Constitution intended this to be so is certain; but to have asserted it against Congress and the Executive, to have vindicated it by that easy yet adamantine demonstration than which the reasonings of mathematics show nothing surer, to have inscribed this vast truth of conservatism upon the public mind, so that no demagogue not in the last stages of intoxication denies it,—this is an achievement of statesmanship (of the judiciary) of which a thousand years may not exhaust or reveal all the good." Marshall, Comp. Const. Dec. 38; 1 Marshall Memorial 363.

In discussing this power of the courts, in exercising the judicial function of government, to declare legislative enactments void when that body has, in such enactment, gone beyond or outside of the power granted to it, Professor Lieber uses the following language (Civil Liberty and Self Government 162): "The supremacy of the law requires that where enacted constitutions form the fundamental law there be some authority which can pronounce whether the legislature itself has or has not transgressed it in the passing of some law, or whether a specific law conflicts with the superior law, the constitution. If a separate body of men were established to pronounce upon the constitutionality of a law, nothing would be gained. It would be as much the creature of the constitution as the legislature, and might

err as much as the latter. Quis custodiet custodes? Tribunes or ephori? They are as apt to transgress their powers as other mortals. But there exists a body of men in all well-organized polities, who, in the regular course of business assigned to them, must decide upon clashing interests, and do so exclusively by the force of reason, according to law, without the power of armies, the weight of patronage or imposing pomp, and who, moreover, do not decide upon principles in the abstract, but upon practical cases which involve them—the middle men between the pure philosophers and the pure men of government. These are the judges—courts of law. When laws conflict in actual cases, they must decide which is the superior law and which must yield; and as we have seen that according to our principles every officer remains answerable for what he officially does, a citizen, believing that the law he enforces is incompatible with the superior law, the constitution, simply sues the officer before the proper court as having unlawfully aggrieved him in the particular case. The court, bound to do justice to every one, is bound also to decide this case as a simple case of conflicting laws. The court does not decide directly upon the doings of the legislature. It simply decides, for the case in hand, whether there actually are conflicting laws, and, if so, which is the higher law that demands obedience when both may not be obeyed at the same time. As, however, this decision becomes the leading decision for all future cases of the same import, until, indeed, proper and legitimate authority shall reverse it, the question of constitutionality is virtually decided, and it is decided in a natural, easy, legitimate, and safe manner, according to the principle of the supremacy of the law and the independence of justice. It is one of the most interesting and important evolutions of the government of law, and one of the greatest protections of the citizen. It may well be called a very jewel of Anglican liberty, one of the best fruits of our political civilization.''

Judge Cooley thus treats the same question: ''So also there are cases where, after the two houses of the legislature have passed upon the question, their decision is in a certain sense subject to review by the governor. If a bill is introduced the constitutionality of which is disputed, the passage of the bill by the two houses must be regarded as the expression of their judgment that, if approved, it will be a valid law. But if the constitution confers upon the governor a veto power, the same question of constitutional authority will be brought by the bill before him, since it is manifestly his duty to withhold approval from any bill which, in his opinion, the legislature ought not for any reason pass. And what reason so forcible as that the constitution confers upon them no authority to enact it? In all these and the like cases, each department must act upon its own judgment, and cannot be required to do that which it regards as a violation of the constitution, on the ground solely that another department which, in the course of the discharge of its own duty, was called upon first to act, has reached the conclusion that it will not be violated by the proposed action. But setting aside now those cases to which we have referred, where from the nature of things, and perhaps from explicit terms of the constitution, the judgment of the department or officer acting must be final, we shall find the general rule to be, that whenever action is taken which may become the subject of a suit or proceeding in court, any question of constitutional power or right that was involved in such action will be open for consideration in such suit or proceeding, and that as the courts must finally settle the particular controversy, so also will they finally determine the question of constitutional law. For the constitution of the State is higher in authority than any law, direction, or order made by any body or any officer assuming to act under it, since such body or officer must exercise a delegated authority, and one that must necessarily be subservient to the instrument by which the dele-

gation is made. In any case of conflict the fundamental law must govern, and the act in conflict with it must be treated as of no legal validity. But no mode has yet been devised by which these questions of conflict are to be discussed and settled as abstract questions, and their determination is necessary or practical only when public or private rights would be effected thereby. They then become the subject of legal controversy; and legal controversies must be settled by the courts. The courts have thus devolved upon them the duty to pass upon the constitutional validity, sometimes of legislative, and sometimes of executive acts. And as judicial tribunals have authority, not only to judge, but also to enforce their judgments, the result of a decision against the constitutionality of a legislative or executive act will be to render it invalid through the enforcement of the paramount law in the controversy which has raised the question. The same conclusion is reached by stating in consecutive order a few familiar maxims of the law. The administration of public justice is referred to the courts. To perform this duty, the first requisite is to ascertain the facts, and the next to determine the law applicable to such facts. The constitution is the fundamental law of the State, in opposition to which any other law, or any direction or order, must be inoperative and void. If, therefore, such other law, direction, or order seems to be applicable to the facts, but on comparison with the fundamental law the latter is found to be in conflict with it, the court, in declaring what the law of the case is, must necessarily determine its validity, and thereby in effect annul it. The right and the power of the courts to do this are so plain, and the duty is so generally— we may almost say universally—conceded, that we should not be justified in wearying the patience of the reader in quoting from the very numerous authorities upon the subject." Cooley, Const. Lim. (7th ed.) 76-78.

The power to determine and declare the law covers the whole body of the law, fundamental and ordinary, the latter

being those laws which apply to particulars and are tentative, occasional and in the nature of temporary expedients. Whether legislative action is void for want of power in that body, or because the constitutional forms or conditions have not been followed or have been violated, may become a judicial question, and upon the courts the inevasible duty to determine it falls. And so the power resides in the courts, and they have, with practical uniformity, exercised the authority to determine the validity of proposal, submission or ratification of change in the organic law. Such is the rule in this State. *State* v. *Swift* (1880), 69 Ind. 505; *In re Denny* (1901), 156 Ind. 104, 59 N. E. 357, 51 L. R. A. 722. See, also, *Bott* v. *Wurts* (1899), 63 N. J. L. 289, 43 Atl. 744, 45 L. R. A. 251; *State, ex rel.,* v. *Dahl* (1896), 6 N. Dak. 81, 68 N. W. 418, 34 L. R. A. 97; *Warfield* v. *Vandiver* (1905), 101 Md. 78, 60 Atl. 538, 4 Ann. Cas. 692; *Green* v. *State Board, etc.* (1896), 5 Idaho 130, 47 Pac. 259, 95 Am. St. 169; *Hays* v. *Hays* (1897), 5 Idaho 154, 47 Pac. 732; *State* v. *McBride* (1836), 4 Mo. 303, 29 Am. Dec. 636; *Edwards* v. *Lesueur* (1896), 132 Mo. 410, 33 S. W. 1130, 31 L. R. A. 815; *Russell* v. *Croy* (1901), 164 Mo. 69, 63 S. W. 849; *Gabbert* v. *Chicago, etc., R. Co.* (1902), 171 Mo. 84, 70 S. W. 891; *State, ex rel.,* v. *Foraker* (1889), 46 Ohio St. 677, 23 N. E. 491, 6 L. R. A. 422; *State, ex rel.,* v. *Winnett* (1907), 78 Neb. 379, 110 N. W. 1113, 10 L. R. A. (N. S.) 149, 15 Ann. Cas. 781; *Tecumseh Nat. Bank* v. *Sanders* (1897), 51 Neb. 801, 71 N. W. 779; *Green* v. *Willer* (1856), 32 Miss. 650; *State, ex rel.,* v. *Powell* (1900), 77 Miss. 543, 27 South. 927; *State, ex rel.,* v. *Timme* (1882), 54 Wis. 318, 11 N. W. 785; *Koehler & Lange* v. *Hill* (1883), 60 Iowa 543, 14 N. W. 738, 15 N. W. 609; *State, ex rel.,* v. *Brookhart* (1901), 113 Iowa 250, 84 N. W. 1064; *Labaugh* v. *Cook* (1905), 127 Iowa 181, 102 N. W. 1121; *Collier* v. *Frierson* (1854), 24 Ala. 100; *State, ex rel.,* v. *Tooker* (1894), 15 Mont. 8, 37 Pac. 840, 25 L. R. A. 560; *Durfee* v. *Harper* (1899), 22 Mont. 354, 56 Pac. 582; *Oakland Pav.*

*Co.* v. *Hilton* (1886), 69 Cal. 479, 11 Pac. 3; *Livermore* v. *Waite* (1894), 102 Cal. 113, 36 Pac. 424, 25 L. R. A. 312; *West* v. *State* (1905), 50 Fla. 154, 39 South. 412; *State, ex rel.,* v. *Tufly* (1887), 19 Nev. 391, 12 Pac. 835, 3 Am. St. 895; *State, ex rel.,* v. *Dean* (1909), 84 Neb. 344, 121 N. W. 719; *Westinghausen* v. *People* (1880), 44 Mich. 265, 6 N. W. 641; *Carton* v. *Secretary of State* (1908), 151 Mich. 337, 115 N. W. 429; *Murphy Chair Co.* v. *Attorney-General* (1907), 148 Mich. 563, 112 N. W. 127; *Lovett* v. *Ferguson* (1897), 10 S. Dak. 44, 71 N. W. 765; *State, ex rel.,* v. *Herried* (1897), 10 S. Dak. 109, 72 N. W. 93; *Commonwealth, ex rel.,* v. *Griest* (1900), 196 Pa. St. 396, 46 Atl. 505, 50 L. R. A. 568; *Wells* v. *Bain* (1874), 75 Pa. St. 39, 15 Am. Rep. 563; *Trustees, etc.,* v. *McIver* (1875), 72 N. C. 76; *Prohibitory Amendment Cases* (1881), 24 Kan. 700; *Kadderly* v. *Portland* (1903), 44 Or. 118, 74 Pac. 710, 75 Pac. 222; *Rice* v. *Palmer* (1906), 78 Ark. 432, 96 S. W. 396; *Dayton* v. *City of St. Paul* (1876), 22 Minn. 400; *State, ex rel.,* v. *Young* (1881), 29 Minn. 474, 9 N. W. 737; *Secombe* v. *Kittelson* (1882), 29 Minn. 555, 12 N. W. 519; *State, ex rel.,* v. *Stearns* (1898), 72 Minn. 200, 75 N. W. 210; *McBee* v. *Brady* (1909), 15 Idaho 761, 100 Pac. 97; *McConaughy* v. *Secretary of State* (1909), 106 Minn. 392, 401, 119 N. W. 408.

In all of the cases just cited the courts assumed jurisdiction, and determined questions relating to the initiation and adoption of proposed organic change. In many of them the power of the courts over the question was vigorously denied by counsel, but in every instance it was held that the question was a judicial one, and for the court's determination when presented concretely by a case brought before it involving it. Nor is the general rule impaired or weakened by exceptions such as the case of *Worman* v. *Hagan* (1893), 78 Md. 152, 27 Atl. 616, 21 L. R. A. 716, where it was held that as a special tribunal for determining whether amendments had carried had been created by the constitu-

tion itself, which was therefore conclusive; or the case of *Miller* v. *Johnson* (1892), 92 Ky. 589, 18 S. W. 522, 15 L. R. A. 525, where, after an irregularly formed and promulgated constitution had been recognized by the people, the executive and the legislative departments, and great interests had arisen under it, and important rights existed by virtue of it, the courts refused to pass upon questions raised as to its validity as the organic law of the state; or the celebrated case of *Luther* v. *Borden* (1849), 7 How. 1, 12 L. Ed. 581, which involved the episode in the history of our country known as Dorr's Rebellion.

In the late and well-considered case of *McConaughy* v. *Secretary of State, supra,* which was a proceeding to contest an election on proposed constitutional amendments, it was contended that the adoption of organic law was political action and beyond the jurisdiction of the courts. In the opinion of the court, by Elliott, J., it was said: "An examination of the decisions shows that the courts have almost uniformly exercised the authority to determine the validity of the proposal, submission, or ratification of constitutional amendments." And after reviewing many of the cases, and stating the principles upon which written constitutions with us are based, and defining the discretionary or political powers given into the hands of the departments, it was said, in affirming the power of the courts over the question stated: "Thus the legislature may in its discretion determine whether it will pass a law or submit a proposed constitutional amendment to the people. The courts have no judicial control over such matters, not merely because they involve political questions, but because they are matters which the people have by the constitution delegated to the legislature. The Governor may exercise the powers delegated to him, free from judicial control, so long as he observes the laws and acts within the limits of the power conferred. His discretionary acts cannot be controllable, not primarily because they are of a political nature, but be-

cause the constitution and laws have placed the particular matter under his control. But every officer under a constitutional government must act according to law and subject to its restrictions, and every departure therefrom or disregard thereof must subject him to the restraining and controlling power of the people, acting through the agency of the judiciary; for it must be remembered that the people act through the courts, as well as through the executive or the legislature. One department is just as representative as the other, and the judiciary is the department which is charged with the special duty of determining the limitations which the law places upon all official action. The recognition of this principle, unknown except in Great Britain and America, is necessary, to 'the end that the government may be one of laws and not of men'—words which Webster said were the greatest contained in any written constitutional document.''

The jurisdiction of the courts was questioned on the same ground in the late case of *McBee* v. *Brady, supra,* which was a mandamus proceeding against the governor to compel him to call an election pursuant to amendments claimed to have been adopted, and the supreme court of Idaho said on page 775: ''The constitution is the fundamental law of the state. It received its force from the express will of the people, and in expressing that will the people have incorporated therein the method and manner by which the same can be amended and changed, and when the electors of the state have incorporated into the fundamental law the particular manner in which the same may be altered or changed, then any course which disregards that express will is a direct violation of that fundamental law. These provisions having been incorporated in the constitution, where the validity of a constitutional amendment depends upon whether such provisions have been complied with, such question presents for consideration and determination a judicial question, and the courts of· the state are the only

tribunals vested with power under the constitution to de-
termine such questions. * * * Whether the constitu-
tional method has been pursued is purely a judicial ques-
tion, and no authority is vested in any officer, department of
state, body politic, or tribunal, other than the courts, to con-
sider and determine that matter.''

In the well-considered case of *Rice* v. *Palmer, supra,* after
a consideration of the question, the court in its opinion
concluded thus on page 446: ''There can be little doubt
.that the concensus of judicial opinion is that it is the abso-
lute duty of the judiciary to determine whether the con-
stitution has been amended in the exact and precise manner
required by the constitution, unless perchance a special
tribunal has been erected to determine this question; and
even then many of the authorities hold that this tribunal
cannot be permitted to illegally amend the organic law.
Therefore it is the duty of the court to decide the question
on its merits.''

In the opinion of the supreme court of Mississippi, in the
case of *State, ex rel.,* v. *Powell, supra,* the question, after
full consideration, was disposed of as follows at page 566:
''The true view is that the constitution, the organic law of
the land, is paramount and supreme over governor, legisla-
ture and courts. When it prescribes the exact method in
which an amendment shall be submitted, and defines posi-
tively the majority necessary to its adoption, these are con-
stitutional directions mandatory upon all departments of
the government, and without strict compliance with which
no amendment can be validly adopted. Whether an amend-
ment has been validly submitted or validly adopted depends
upon the fact of compliance or non-compliance with the
constitutional directions as to how such amendments shall
be submitted and adopted, and whether such compliance
has, in fact, been had, must, in the nature of the case, be a
judicial question.''

In the case of *Bott* v. *Wurts, supra,* which was a proceed-

ing by writ of *certiorari* at the instance of taxpayers, to review the statement of the state board of canvassers of the result of an election on amendments, it was claimed that the concurrence of the board of state canvassers and the executive department of the government, in their respective official functions, placed the subject-matter beyond the cognizance of the judicial department of the government. The board of canvassers was composed of the governor and four or more members of the senate whom it was provided he should call to sit with him and canvass the vote and declare the result. And of this board it was said by the court, speaking through Dixon, J.: "It should be observed that neither the board of canvassers nor the governor was exercising a function devolved upon them by the Constitution; each derived authority wholly from the statute. The powers conferred upon them might as well, if the legislature had so willed, have been cast upon any other body." And of its right to take jurisdiction it was said: "In New Jersey the judicial authority was thus declared by Chief Justice Beasley, in *State, ex rel.,* v. *Rogers* [1894], 27 Vroom 480, 616 [28 Atl. 726, 29 Atl. 173, 23 L. R. A. 354], and on this point he was delivering the opinion of every justice of the supreme court: 'When the inquiry is whether the legislature or any other body or officer has violated the regulations of the Constitution, it is entirely plain that the decision of that subject must rest exclusively with the judicial department of the government.' * * * For the exercise of that authority with regard to an attempted amendment of the Constitution, in conformity with the express provisions of that instrument, no occasion has heretofore arisen in this state; but we perceive no good reason for excluding such a case from the general principle. If a legislative enactment, which may be repealed in a year, or an executive act, which affects only a single individual, cannot be allowed to stand if it contravenes the Constitution, *a fortiori* a change in the fundamental law, which is much more permanent and affects

the whole community, should not be permitted to take place in violation of the constitutional mandates."

The supreme court of Alabama in *Collier* v. *Frierson, supra,* made this declaration on the subject: "We entertain no doubt, that, to change the constitution in any other mode than by a convention, every requisition which is demanded by the instrument itself must be observed, and the omission of any one is fatal to the amendment. We scarcely deem any argument necessary to enforce this proposition. The constitution is the supreme and paramount law. The mode by which amendments are to be made under it is clearly defined. It has been said, that certain acts are to be done,— certain requisitions are to be observed, before a change can be effected. But to what purpose are these acts required, or these requisitions enjoined, if the legislature or any other department of the government, can dispense with. them? To do so, would be to violate the instrument which they are sworn to support, and every principle of public law and sound constitutional policy requires the courts to pronounce against every amendment, which is shown not to have been made in accordance with the rules prescribed by the fundamental law."

In the case of *Koehler & Lange* v. *Hill, supra,* Day, C. J., speaking for the court said on page 616: "The authority opposed to the view advanced by appellant's counsel is most satisfactory and conclusive, and, so far as we have been able to discover, is without conflict. Not only must a constitution be amended in the manner prescribed in the existing constitution, but it is competent for the courts, when the amendment does not relate to their own powers or functions, to inquire whether, in the adoption of the amendment, the provisions of the existing constitution have been observed." And again: "While it is not competent for courts to inquire into the validity of the constitution and form of government under which they themselves exist, and from which they derive their powers, yet, when the existing constitution

prescribes a method for its own amendment, an amendment thereto, to be valid, must be adopted in strict conformity to that method; and it is the duty of courts, in a proper case, when an amendment does not relate to their own powers or functions, to inquire whether, in the adoption of the amendment, the provisions of the existing constitution have been observed, and, if not, to declare the amendment invalid and of no effect.''

It is said in 6 Am. and Eng. Ency. Law (2d ed.) 908: ''The courts have full power to declare that an amendment to the constitution has not been properly adopted, even though it has been so declared by the political departments of the state.'' And to this conclusion the whole stream of authority harmoniously runs.

Counsel do not expressly deny the existence of this power in the courts of this State to declare the law, but their position is that the provisions of our Constitution, which divide the governmental elements—the legislative, the executive and the judicial—and bestow them on three separate agencies,—being accompanied by the declaration that ''no person charged with official duty under one of these departments shall exercise any of the functions of another except in this Constitution expressly provided''—the latter is a limitation of the judicial power when it is sought to coerce or restrain the performance of legislative or executive acts. And this, it is claimed, is sought to be done in this case, and upon that ground the jurisdiction of the court is challenged. This position of counsel, in so far as it relates to executive acts, grows out of the fact that §16 of the general election law (Acts 1889 p. 157, §6897 Burns 1908) provides that ''the governor of the state, and two qualified electors by him appointed, * * * shall constitute a state board of election commissioners;'' and the further fact that the act of 1911, known as Chapter 118 (Acts 1911 p. 205), requires the performance by this board of certain purely ministerial duties re-

lating to the submission of the so-called "new Constitution"; and the further fact that this action is to enjoin the performance of these duties by the board. The contention of counsel is, that the presence of the Governor on this ministerial board is an absolute bar to the power of the judicial department to enjoin the board in the performance of the ministerial duties placed upon it by the act.

There is entire harmony in the decisions of courts and the writings of commentators in affirming the rule to be that the acts of the governor of a state can in no case

12. be controlled by the courts, directed or coerced by mandamus, or restrained by injunction, in duties strictly and exclusively political and executive, and requiring, therefore, judgment and discretion. The principle, that each department of the government is independent when acting within the sphere of its powers and answerable only to the people, is thus made secure. But there is an irreconcilable conflict of authority upon the question of the

11 judicial control of the official acts of the governors of the various states, in regard to those duties imposed upon them by law, which are purely ministerial in their nature, and which do not necessarily pertain to the functions of the gubernatorial office, and which might have been imposed upon any other state officer. The cases are collected in an elaborate note to the case of *State, ex rel.,* v. *Brooks* (1906), 6 L. R. A. (N. S.) 750. An examination of the reported cases holding that the courts cannot control the ministerial acts of the governor, discloses that a number of them do not involve the question, but merely the attempt to control acts, in the doing of which the governor had a discretion. Such a case indeed is that of *People, ex rel.,* v. *Governor* (1874), 29 Mich. 320, 18 Am. Rep. 89, an opinion of Cooley, J., much followed by later decisions, where it was said: "If we concede that cases may be pointed out in which it is manifest that the governor is left to no discretion the present is certainly not among them, for here, by the law, he

is required to judge, on a personal inspection of the work, and must give his certificate on his own judgment, and not on that of any other person, officer or department.''

And it would seem that by an elimination of such cases the weight of authority, both in the number of decided cases and sound reason, was favorable to the power of the courts. The decisions of this court have not positively and clearly settled the question. In *Governor* v. *Nelson* (1855), 6 Ind. 496, a mandamus was awarded against the Governor to compel him to issue a commission to Nelson as clerk of the circuit court. The case of *Biddle* v. *Willard* (1857), 10 Ind. 62, was an application for a mandamus to require the Governor to issue a commission to Biddle as judge of this court, and the writ was refused on the ground that at the time Biddle claimed to have been elected there was no vacancy in the office. In *Baker* v. *Kirk* (1870), 33 Ind. 517, the circuit court awarded the writ to require the Governor to issue a commission to Kirk as a director of the state prison, and this court sustained the action. It may be said that in neither of these cases was the power of the court over the Governor in the matter of issuing commissions to officers raised or questioned.

The later case of *Gray* v. *State, ex rel.* (1880), 72 Ind. 567, involved the following facts: The General Assembly had authorized the Governor, Attorney-General, Secretary of State and Treasurer of State, or a majority of them, to redeem certain old outstanding improvement bonds. The action was for a writ of mandamus to compel them to do so. In this court the question of the court's power to take jurisdiction was raised and disposed of by the opinion of the court written by Worden, J., in the following words: ''But the question whether a mandate will lie against the Governor to enforce the performance of an executive duty does not arise in this case. The duty of the Governor, in connection with the other officers named in the act, is not executive. The executive power of the State is vested solely in the Gov-

ernor. Constitution, Art. 5, §1. Any power or authority vested by legislation in the Governor, together with other officers or persons, in which they are to have an equal voice with him, cannot be executive, as he alone is vested with the executive power of the State. Any duty which he is by law required to perform, in connection with others, in which they have an equal voice with him, can in no sense be said to be an executive duty. The Governor and the other officers named in the act may well be regarded as constituting a board, organized by the Legislature for the performance of certain duties; and a mandate will lie against them to enforce the performance of the duties prescribed. The duties to be performed under the act, save, perhaps, determining the genuineness of the bonds and coupons presented for redemption, were purely ministerial. A ministerial act is defined to be 'one which a person performs in a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to, or the exercise of, his own judgment upon the propriety of the act being done.' *Flournoy* v. *City of Jeffersonville* [1861], 17 Ind. 169, 174 [79 Am. Dec. 468].''

In the case of *Hovey* v. *State, ex rel.* (1891), 127 Ind. 588, 27 N. E. 175, 11 L. R. A. 763, 22 Am. St. 663, the relator was awarded mandamus to compel the Governor to issue to him a commission as auditor of Jennings county. The Governor appealed, and denied the power of the courts to control his action in the matter. In the opinion of the court written by Coffey, J., the authorities were partly reviewed, and the sharp conflict stated. *Gray* v. *State, ex rel., supra,* was considered, and it was said of it: ''It is unnecessary that we should express our approval or disapproval of this case, as it must be apparent to every one, upon a moment's reflection, that the case before us is distinguished from this case and rests upon entirely different principles.'' And the conclusion was stated thus: ''We think the Governor's de-

cision in this matter must be taken as final. The case is not one where the Governor is acting as the member of a board created by legislative enactment, in a matter wholly disconnected with his functions as Governor of the state; but it is a case where he is required to act as Governor.'' It may be noted that article 15, §6, of the Constitution provides that ''all commissions shall issue in the name of the state, shall be signed by the Governor'', etc. Thus we see that the duty of the Governor to issue commissions is a duty placed upon that officer by the Constitution, and the General Assembly may not place it elsewhere. On the other hand, the state board of election commissioners is purely a creature of the legislature; the personnel of its membership and the character of the duties placed upon it and the manner of their exercise, are entirely under the control of that body. No provision of the Constitution and no compelling reason bound the legislature to make the Governor a member of the board. It might with equal right and perhaps with greater propriety, have made the board consist of the Secretary of State and two qualified electors, or any other subordinate state officer, or three qualified electors to be appointed by the Governor, rather than to place upon the chief magistrate the subalternate ministerial duty of supervising the preparation and the distribution of the state ballots. Had this been done, and the board so constituted, then it could not be doubted that the board's acts would be subject to the supervisory jurisdiction of the courts, for there is no considerable authority, if any, for claiming immunity from judicial cognizance in the performance of a ministerial duty, for any officer other than the executive head of the State. The Governor is one of the three members of the board. As such member he has identically, under the law, the same duties as each of the other two, with just such power and authority in the transaction of the duties directed as one of the others, and no more. The two members may out-vote him, control the action of the board, and proceed unlawfully; and

that action may infringe the rights of citizens. Must it be said, then, in such case, that the board is above the law and beyond the reach of the power of the courts to declare the law and protect rights? No principle of law or sound reason permits an answer in the affirmative. To say that the presence of the Governor on a board as a member is a bar to the jurisdiction of the courts, while without him the board, with identically the same duties, is subject to judicial cognizance, is to say that rights may be secure and enforceable in the latter case, and without remedy in the former. This is contrary to sound legal principles. Our statutes contain many instances of the association of the Governor with administrative officers and citizens on boards for the performance of various governmental duties. A list of many of these, nearly twenty in number, is given in *French* v. *State, ex rel.* (1895), 141 Ind. 618, 41 N. E. 2, 29 L. R. A. 113, at page 637.

The courts of this State took jurisdiction and determined on its merits, a suit against one of these boards—the state board of education—to enjoin it and the individual members from letting a contract. *Silver, Burdett & Co.* v. *Indiana State Board, etc.* (1905), 35 Ind. App. 438, 72 N. E 829. The possible evil effects of holding these boards to be outside of the pale of the jurisdiction of the courts are so obvious that such a rule cannot be sanctioned In the great majority of cases in which a Governor's immunity from judicial control has been considered and passed upon, the action was for mandamus to compel action, and not injunction to restrain; and counsel for appellants contend that the remedies are not correlative, and if conceded that mandamus would lie against the board, still it is claimed, injunction will not. An unconstitutional law gives no power and imposes no duty. If the board had refused to perform the duties in relation to the submission which the act of 1911, *supra,* seeks to place upon it, on the belief that the act was invalid, mandamus would have been available to compel its

action.   The remedy of injunction, on the other hand, may be resorted to, in order to restrain the board from acting. Eminent authority is against counsels' contention.   In 5 Pomeroy, Eq. Jurisp. §328, it is said: "An injunction will not issue against an executive officer of the government, nor against one acting under him, to restrain the performance or execution of administrative acts and orders within the scope of his authority.   This is based upon the principle which governs also the legal remedy of mandamus.   It would be contrary to our theory of government for the judicial department to interfere with the reasonable discretion of the executive.   Hence, courts of law and of equity refuse the remedies of mandamus and injunction when they will have the effect of controlling a reasonable discretion.   Where no question of discretion is involved, both law and equity will interfere without hesitation.   It is generally stated that mandamus may issue in a proper case to compel the performance of a ministerial act.   The corresponding statement as to injunction is that it may issue in a proper case to restrain an act in excess of the officer's authority."

In *Noble* v. *Union River Logging R. Co.* (1893), 147 U. S. 165, 172, 13 Sup. Ct. 271, 37 L. Ed. 123, it was said: "If he [the secretary of state] has no power at all to do the act complained of, he is as much subject to an injunction as he would be to a mandamus if he refused to do an act which the law plainly required him to do."   In *Board, etc.,* v. *McComb* (1875), 92 U. S. 531, 23 L. Ed. 623, the court, in discussing the power of courts to enjoin state officials, said: "But it has been well settled, that, when a plain official duty, requiring no exercise of discretion, is to be performed, and performance is refused, any person who will sustain personal injury by such refusal may have a mandamus to compel its performance; and when such duty is threatened to be violated by some positive official act, any person who will sustain personal injury thereby, for which adequate compensation cannot be had at law, may have an injunction to pre-

vent it. In such cases, the writs of mandamus and injunction are somewhat correlative to each other. In either case, if the officer plead the authority of an unconstitutional law for the nonperformance or violation of his duty, it will not prevent the issuing of the writ. An unconstitutional law will be treated by the courts as null and void. *Osborn* v. *Bank of the United States* [1824], 9 Wheat. 859 [6 L. Ed. 204]; *Davis* v. *Gray* [1872], 16 Wall. 203, 220 [21 L. Ed. 447].

In *State, ex rel.,* v. *Cunningham* (1892), 81 Wis. 440, 504, 51 N. W. 724, 15 L. R. A. 561, the supreme court of that state uses the following language: "Inasmuch as the use of the writ of injunction in the exercise of the original jurisdiction of this court is correlative with the writ of mandamus, the former issuing to restrain where the latter compels action, it is plain that this case, as against the respondent, is a proper one for an injunction to restrain unauthorized action by him in a matter where his duties are clearly ministerial and affect the sovereignty, rights, and franchises of the State, and the liberties of the people.

And in *State, ex rel.,* v. *Cunningham* (1892), 83 Wis. 90, 127, 53 N. W. 35, 17 L. R. A. 145, 35 Am. St. 27, the court quotes from Chief Justice Ryan in a former case: " 'And it is very safe to assume that the constitution gives injunction to restrain excess in the same class of cases as it gives mandamus to supply defect; the use of the one writ or the other in each case turning solely on the accident of over-action or shortcoming of the defendant. And it may be that where defect and excess meet in a single case, the court might meet both, in its discretion, by one of the writs, without being driven to send out both, tied together with red tape, for a single purpose.' "

The case of *Mott* v. *Pennsylvania R. Co.* (1858), 30 Pa. St. 9, 72 Am. Dec. 664, was a suit for injunction, against the railroad company and the governor and the treasurer of the state, brought by the canal commissioners of the state

as officials and as individual taxpayers, to restrain the sale of property of the state under the provisions of an unconstitutional law. In sustaining injunction as a proper remedy, the opinion of the court, delivered by Lewis, C. J., said on page 33: "It is objected that the governor is not subject to this form of our jurisdiction. It is far from our intention to claim the power to control him 'in any matter resting in executive discretion. But the rule of law seems to be, that when the legislature proceeds to impose on an officer duties which are purely ministerial, he may be coerced by mandamus or restrained by injunction, as the rights of the parties interested may require. In such a case no individual in the land, however high in power, can claim to be above the law. * * * And if it be shown that the act under which he claims authority to dispose of the public property or to divest private rights, is unconstitutional and void, he may of course, like any other individual, be restrained from proceeding."

The case of *Lynn* v. *Polk* (1881), 76 Tenn. 121, was an action to enjoin the acts of a state funding board under a law claimed to be unconstitutional and so held. The board was composed of the secretary, comptroller and treasurer of the state. It was contended that the action would not lie, and that the court was without jurisdiction for the reason that the law of the state provided that no court in the state had jurisdiction to entertain any suit against the state or any officer of the state. In disposing of this contention the court said on page 152: "The men who shall for the time being fill these offices are designated, as the constituent elements, making up the unit created by the act, designated a funding board. This unit, so constituted, acts as one, any two of them constituting a quorum for the transaction of the business in hand. I cannot see how this legal thing thus created can be conceived of as an officer of the State. It certainly is not the comptroller, nor treasurer, nor secretary of the State, for it is inconceivable

that the three men filling these offices should be combined into one, and be either officer. The acts of the board are no more the acts of these officers as such, than would be the case if one justice of the peace, one constable, and the sheriff of Davidson county had constituted the board, would have made the act of the board the official act of either of these officers.'' And it was, moreover, held that an officer of the state, executing an unconstitutional law, is not acting by authority of the state, and, therefore, that taxpayers, citizens of the state, could maintain a bill *quia timet* to restrain executive officers from proceeding under such unconstitutional and void law.

In *Pennoyer* v. *McConnaughy* (1891), 140 U. S. 1, 11 Sup. Ct. 699, 35 L. Ed. 363, injunction was granted against a board of land commissioners, of which the governor, secretary of state and treasurer of state were members, and it was said by Lamar, J: ''It must be borne in mind that this suit is not nominally against the governor, secretary of state, and treasurer, as such officers, but against them collectively, as the board of land commissioners. It must also be observed that the plaintiff is not seeking any affirmative relief against the State or any of its officers. * * * All that he asks is, that the defendants may be restrained and enjoined from doing certain acts which he alleges are violative of his contract made with the State when he purchased his lands. He merely asks that an injunction may issue against them to restrain them from acting under a statute of the State alleged to be unconstitutional, which acts will be destructive of his rights and privileges, and will work irreparable damage and mischief to his property rights. The case cannot be distinguished, in principle, from *Osborn* v. *Bank of the United States* [(1824), 9 Wheat. 737, 6 L. Ed. 204], *Davis* v. *Gray* [(1872), 16 Wall. 203, 21 L. Ed. 407], *Board, etc.,* v. *McComb* [(1875), 92 U. S. 531, 23 L. Ed. 623], and *Allen* v. *Baltimore, etc., R. Co.* [(1884), 114 U. S. 311, 5 Sup. Ct. 925, 29 L. Ed. 200].''

It is a part of appellants' contention that, as the general rule is that courts will not issue writs that are unavailing, injunction should not be decreed in this. For it is assumed by counsel that the Governor, being invested by the Constitution with supreme executive authority, with control over the military forces of the State, the courts could not enforce the decree against the board of which the law makes him a member if he chose to disregard it. This consideration presents no reason for the court to refuse to exercise jurisdiction. It surely does not follow that compulsory action would be needed in aid of the writ. This is a government of law, and all are amenable to it. To the courts the people have given the power, and charged them with the duty to declare what it is; and this duty cannot be lightly disregarded however unpleasant and embarrassing it may be. Without the aid of sword or purse, courts have met with little difficulty from disobedience of their decrees, and this has come equally from a generally conscientious discharge of duty by the courts and a respect for the law which is inherent in our people. Where the question presented to a court is a judicial question, it would be sheer, inexcusable cowardice and a violation of duty for it to decline the exercise of its jurisdiction because of a lack of power to enforce its decree if other agencies of government should refuse to comply with it. Moreover, we have no right to reflect on any officer of a coördinate department, by entertaining the assumption that the law, as declared by the courts, might be disregarded.

The further contention of counsel, that the court is without jurisdiction for the reason that courts may not interfere with legislative action, has for its basis the claim that, using the words of counsel, the writ of injunction in this case, if it does anything, restrains the enactment of a law which is upon its passage, and which may not of course be done. Much of the argument of counsel is

based upon the assumption, that in doing the thing sought to be done through Chapter 118 the General Assembly was acting within its power, and it falls to the ground with the determination of the contrary. Since the act incorporating the proposed organic law was passed in the form of and in accordance with the prescribed rules of ordinary enactments; and since it provided rules of conduct for the action of certain officials, it must be subject to interpretation and construction of the courts. The work of the legislature in relation to it is at an end; it has passed beyond any further action of that body; so far as the legislature is concerned, it is a complete enactment. If the legislature was without power to formulate and present the proposed organic law to the people, as we have seen it was, Chapter 118 is void, and the mandate of that body, that the ballot shall be encumbered with the question of its adoption, is of no more force than that of any citizen without authority under the Constitution. The question involved is no more than whether ministerial acts threatened to be done in carrying out the provisions of an unconstitutional act may be enjoined. This, as we have seen, may be done. And there is also authority for the intervention of the courts before proposed constitutional changes have been passed upon by the votes of the electors and the result declared.

In the late case of *Carton* v. *Secretary of State* (1908), 151 Mich. 337, 115 N. W. 429, it appears that the state of Michigan held a constitutional convention in 1907 and 1908. The act which called it provided that the result of its labors should be submitted to the people at the April election in 1908. The convention itself, provided that it should be submitted at the November election of that year. The secretary of state declined to obey the mandate of the convention, believing that that body was without power to direct and fix the time of submission. The president of the convention brought an action for a writ of mandamus to compel him to comply with the directions of the convention.

The writ was awarded by the supreme court, on the ground that under the constitution the authority to fix the time and manner of submission rested in the convention, and that the legislature was without power in the matter.

Another case is that of *Wells* v. *Bain* (1874), 75 Pa. St. 39, 15 Am. Rep. 563. Citizens and voters of the state sued to enjoin commissioners of election, under an ordinance of the convention, to revise the constitution, and other election officers from expending any money in relation to the election, and from holding such election, on the ground that the ordinance of the convention providing for the manner of holding the election on the proposed constitution was void. What was said by Agnew, C. J., on page 56, on the question of jurisdiction, is applicable to the question under consideration: ''The question of jurisdiction has been reserved for the conclusion. The first remark to be made is, that all the departments of government are yet in full life and vigor, not being displaced by any authorized act of the people. As a court we are still bound to administer justice as heretofore. If the acts complained of in these bills are invasions of rights without authority, we must exercise our lawful jurisdiction to restrain them. One of our equity powers is the prevention or restraint of the commission or continuance of acts contrary to law, and prejudicial to the interests of the community or the rights of individuals. *Page* v. *Allen* [1868], 8. P. F. Smith 338 [98 Am. Dec. 272], and the authorities cited by counsel are precedents sufficient to justify the exercise in this case. Here the court is asked to restrain a body of men attempting to proceed contrary to law—to set aside the lawful election system of the city, and substitute an unlawful system in its place. Their acts are not only contrary to law, but are prejudicial to the interests of the community, by endangering the rights of all the electors, through means of an illegal election held by unauthorized officers. In *Patterson* v. *Barlow* [1869], 10 P. F. Smith 54, the aid of the court was

asked not to prevent acts contrary to law, but to strike down the only lawful system of election in the city, and thereby to disfranchise all its citizens, for all other election laws had been actually repealed. We said then it was more than doubtful how far private citizens can call for an injunction beyond their own invaded rights, or ask to restrain a great system of law in its public aspects. In this case we are called upon not to strike down, but to protect a lawful system, and to prevent intrusion by unlawful authority. If this ordinance is invalid, as we have seen it is as to the city elections, the taxes of the citizens will be diverted to unlawful uses, the electors will be endangered in the exercise of their lawful franchise, and an officer necessary to the lawful execution of the election law ousted by unlawful usurpation of his functions.''

See, also, *Woods's Appeal* (1874), 75 Pa. St. 59, which was also a suit for injunction growing out of the same ordinance. In *Warfield* v. *Vandiver* (1905), 101 Md. 78, 60 Atl. 538, 4 Ann. Cas. 692, the court of appeals of Maryland sustained the circuit court in issuing a writ of mandamus to require the governor to order publication of a proposed amendment to the constitution of that state. In *Commonwealth, ex rel.*, v. *Griest* (1900), 196 Pa. St. 396, 46 Atl. 505, 50 L. R. A. 568, the same action was taken for the same purpose against the secretary of state.

The case of *Livermore* v. *Waite* (1894), 102 Cal. 113, 36 Pac. 424, 25 L. R. A. 312, was the case in which at the suit of a citizen and taxpayer the secretary of state of California was enjoined from certifying a proposed constitutional amendment to the clerks of the various counties, and from doing other acts toward the submission of it which would entail an expenditure of public money. The legislature had not strictly complied with the constitution, and the supreme court sustained the injunction.

*Holmberg* v. *Jones* (1901), 7 Idaho 752, 758, 65 Pac. 563, was a case against the auditor of state for a mandamus to

compel him to comply with an amendment claimed to have
been adopted. The auditor defended on the ground that
the amendment had not been legally adopted. The court
said: "It cannot be questioned but that any voter of the
state, by proper proceedings in the district court, or in this
court, could have obtained a writ of prohibition restraining
the Secretary of State from certifying the question of adopt-
ing said proposed amendment to the various county audi-
tors. The official ballot could have been protected against
the improper submission of such question, and could have
been purged of the presence of such question thereon, by
proper judicial proceeding."

In the case of *Tolbert* v. *Long* (1910), 134 Ga. 292, 67 S.
E. 826, 137 Am. St. 222, an act had been passed by the
legislature creating a board of county commissioners for
the county of Madison, and providing that the same should
not go into effect until ratified by the vote of the people of
the county. A citizen and taxpayer sued to enjoin the
holding of the election under the act. The jurisdiction of
the court was questioned and the availability of the remedy
of injunction. The court upheld both, saying: "If the
legislative enactment proposed in the present case to become
operative through the medium of a popular election be viola-
tive of the organic law of the land, it is the right of a tax-
payer of the territory to be affected to say that the public
funds shall not be used to defray the expenses of an illegal
election. Besides, no adequate remedy at law occurs
to us, to which the taxpayer might resort after the
election had been duly declared in favor of the
ratification of the enactment, wherein he could as-
sert the unconstitutionality of the law. Certainly
the remedy to enjoin the holding of the election
would be more direct, and better calculated to avoid com-
plications, than to remain passive until the law had been
declared before beginning a proceeding to test its consti-
tutionality. An instance is conceivable where a majority of

the voters included within the limits of the territory to be effected might be decidedly of the opinion that the enactment was opposed to the constitution, and for this reason abstain from voting. If they refrain from voting, the law must be adopted, if at all, by a minority vote, or, if those voters take part, they must do so with the consciousness of participating in an illegality and running the risk of estopping themselves from thereafter calling in question the constitutionality of the act under which the election was held.''

The case of *State, ex rel.*, v. *Thorson* (1896), 9 S. Dak. 149, 68 N. W. 202, 33 L. R. A. 582, *Threadgill* v. *Cross* (1910), 26 Okla. 403, 109 Pac. 558, 138 Am. St. 964, and *People, ex rel.*, v. *Mills* (1902), 30 Colo. 262, 70 Pac. 322, state a different doctrine, but those states have different constitutions.

The power to control by mandamus and injunction the ministerial acts of officers in relation to elections under unconstitutional statutes has been declared by this court and courts of other states in apportionment cases. *Parker* v. *State, ex rel.* (1893), 133 Ind. 178, 32 N. E. 836, 33 N. E. 119, 18 L. R. A. 567; *Brooks* v. *State, ex rel.* (1904), 162 Ind. 568, 70 N. E. 980; *Fesler* v. *Brayton* (1896), 145 Ind. 71, 44 N. E. 37, 32 L. R. A. 578; *State* v. *Wrightson* (1893), 56 N. J. L. 126, 28 Atl. 56, 22 L. R. A. 548; *State, ex rel.*, v. *Cunningham* (1892), 81 Wis. 440, 477, 51 N. W. 724, 15 L. R. A. 561; *State, ex rel.*, v. *Cunningham* (1892), 83 Wis. 90, 53 N. W. 35, 17 L. R. A. 145, 35 Am. St. 27; *State, ex rel.*, v. *VanDuyn* (1888), 24 Neb. 586, 39 N. W. 612. See, also, *Conner* v. *Gray* (1906), 88 Miss. 489, 41 South. 186, 9 Ann. Cas. 120.

Many of the decisions reviewed above establish the capacity of the appellee to sue in such a case as this, and with this view our own cases are in harmony.

15. *Harney* v. *Indianapolis, etc., R. Co.* (1869), 32 Ind. 244, 248; *Board, etc.,* v. *Markle* (1874), 46 Ind. 296; *English* v. *Smock* (1870), 34 Ind. 115, 7 Am. Rep. 215; *Den-*

*ney* v. *State, ex rel.* (1896), 144 Ind. 503, 42 N. E. 929, 31 L. R. A. 726; *Fesler* v. *Braylon, supra; Brooks* v. *State, supra; Remster* v. *Sullivan* (1905), 36 Ind. App. 385, 75 N. E. 860; *Gemmer* v. *State, ex rel.* (1904), 163 Ind. 150, 71 N. E. 478, 66 L. R. A. 82; *Spencer* v. *Knight* (1912), 177 Ind. 564, 98 N. E. 342.

The small proportionate sum of the cost of the election which would fall upon appellee as a taxpayer is not of itself sufficient to destroy his competency to sue. "Where a suit is brought by one or more, for themselves, and all others of a class, jointly interested, for the relief of the whole class the aggregate interest of the whole class constitutes the matter in dispute." *Brown* v. *Trousdale* (1891), 138 U. S. 389, 11 Sup. Ct. 308, 34 L. Ed. 987.

The great importance of the case, involving as it does so vitally the organic law of the State and the relationship of all of the departments of government established by it, has compelled the most thorough, careful and solemn consideration of this court. To the reluctance of courts to declare an ordinary enactment of the legislative body void, because in conflict with the Constitution, has been added other restraining and embarrassing elements, in that as stated all three governmental departments are involved. In the determination of the difficult and delicate questions presented, we acknowledge the aid we have received from the industry and ability of the trial judge and the attorneys in the case.

We find, as indicated, that the act of March 4, 1911, known as Chapter 118 (Acts 1911 p. 205), is in violation of the Constitution, and void, and the judgment of the lower court is affirmed.

Morris and Spencer, JJ., dissent.

## DISSENTING OPINION.

MORRIS, J.—I cannot concur in the majority opinion, and the importance, as well as the novelty, of the questions involved, constrains me to state the reasons for dissenting.

The General Assembly of 1911 passed an act to submit to the electors of the State, at the general election of 1912, for ratification or rejection, a proposed "new Constitution," set out in the body of the act. Acts 1911 p. 205. For the most part, the proposed "new Constitution" is a copy of the present one, the most prominent changes being in authorizing the legislature to enact a workman's compensation law, in changing the number and apportionment of representatives in the legislature, in authorizing the Supreme Court to consist of eleven instead of five members, in requiring certain qualifications for voters, and in authorizing the legislature, on petition of twenty-five per cent of the voters, ·to adopt laws providing for the initiative and referendum, and for the recall of officers, other than judges. The act provides that the proposed Constitution shall go into effect January 1, 1913, if ratified by the voters.

By an act concerning elections, approved March 6, 1889 (Acts 1889 p. 157, §6882 *et seq.* Burns 1908), it is provided, among other things, that the Governor and two electors of the state, by him appointed, shall constitute a state board of election commissioners, whose duty it shall be to prepare and distribute ballots at state elections. Section 62 of the act, §6944 Burns 1908, requires·the board, "whenever any *constitutional amendment,* or *other question,* is required by law to be submitted to popular vote," to cause a brief statement of the same to be printed on the state ballots, and the words "Yes" and "No", under the same, so that the elector may indicate his approval or disapproval of the constitutional amendment or other question submitted. Section 25 of the act, §6907 Burns 1908, requires the Secretary of State, whenever such amendment or question

is to be submitted, to certify the same to the clerks of the circuit courts of the State, not less than thirty days before the election.

The complaint, among other things, alleges that the legislature of 1911 was without power to propose for submission to the electors the instrument in controversy; that the latter is not, in fact, a new Constitution, but is the present one with a series of amendments, and its submission to the electors in 1912 conflicts with our Constitution, which requires amendments thereto to be considered by two sessions of the legislature before submission to popular vote; that the proposed Constitution, in authorizing, under certain conditions, the legislature to adopt laws for the initiative and referendum, conflicts with the Federal Constitution, which guarantees to every state a republican form of government, and is also void, because of its provisions relating to the apportionment and representation in the legislature.

In his complaint, plaintiff further avers that "he himself, and all the electors and other citizens of the state *have the right to have it determined, decided, and adjudicated and published by the courts so as to know before the election* \* \* \* *whether the said act is a constitutional exercise of the legislative power of the General Assembly, and whether, if adopted, said new constitution would be valid or void.*" (Italics here and throughout opinion, mine.)

The court states, in its special finding of facts, among other things, that plaintiff is a citizen, elector and taxpayer of Washington township, Marion county, and owns property assessed at $24,840; that the assessed value of all the property in Indiana is $1,843,341,000; that unless enjoined defendants will perform the several acts, relating to this instrument, required of them by statute. It is further found that the expense of submission, "to be paid out of the treasury of the state and the several counties \* \* \* will aggregate in all between $1,000 and $2,000.

The court stated its conclusions of law, in substance, as

follows: The act of 1911, submitting the proposed new Constitution to the voters, is void (1) because of lack of power in the legislature to propose and submit the same; (2) because the instrument was proposed in violation of our present Constitution; (3) because the instrument is in violation of articles two, four and five of the ordinance adopted July 14, 1787, by the congress of the Confederacy of the United States of America, and violative of §4 of the act of congress of the United States of America, enabling the people of Indiana to form a state government, and violative of the ordinance of the people of the Territory of Indiana, adopted June 29, 1816, securing to the people of Indiana proportionate representation in the legislature; and (4) because the instrument is violative of the Virginia act, ceding to the United States the Northwest Territory, which provided that the states formed therefrom should be republican, when admitted as members of the Federal union, and violative of article five of the ordinance of 1787, declaring that the states formed in such territory shall be republican in form, and violative of §4 of the act of congress of April 16, 1816, enabling the people of Indiana Territory to form a state government, providing that the same, when formed, should be republican, and violative of article 4, §4, of the Federal Constitution, which secures to each state a republican form of government. The fifth conclusion is that plaintiff is entitled to an injunction against Ellingham, Secretary of State, prohibiting him from certifying, before the election, to the several clerks, the proposed constitution; and the sixth is that Governor Marshall, and Bachelder and Roemler, constituting the board of election commissioners, should be enjoined from causing any statement of or concerning the proposed Constitution to be printed on any ballots to be used by the voters at the general election in November, 1912, *or any election to be held in Indiana.* Each defendant excepted to each conclusion of law. The

defendants separately and severally moved in arrest of
judgment, asserting, as grounds therefor, that the court had
no jurisdiction of the subject-matter; that the court was
without jurisdiction to enjoin the Governor of the State;
that the court is without power to interfere with the execu-
tive department of the State in the ·discharge of its
functions; that "the courts are not given a prerogative to
guard the people against themselves in the matter of adopt-
ing organic law;" that a judgment pursuant to the con-
clusions of law would involve a usurpation of power by the
judicial department; that the court has no power to
determine political questions or enjoin legislative action.
The Governor separately filed a like motion.

Appellants insist here, among other things, that the
court erred in each of its conclusions of law, and was with-
out jurisdiction over the subject-matter of the action.

The question of jurisdiction is never a technical one, and
where it appears that the lower court was devoid of power
to determine the matters in issue, it is not only unnecessary,
but improper, for this court to consider any other question
presented. *Smith* v. *Myers* (1886), 109 Ind. 1, 9 N. E. 692,
58 Am. Rep. 375, and cases cited; *State, ex rel.,* v. *Thorson*
(1896), 9 S. Dak. 149, 68 N. W. 202, 33 L. R. A. 582.

Appellants contend, that as to the Governor, the court
was without jurisdiction, because it has no power to re-
strain the head of the executive department of the gov-
ernment. Jurisdiction is the power to hear and determine
a matter in controversy, and to carry into effect the judg-
ment rendered. *Smith* v. *Myers, supra; Robertson* v. *State,
ex rel.* (1887), 109 Ind. 79, 10 N. E. 582, 10 N. E. 643;
*People, ex rel.,* v. *Morton* (1898), 156 N. Y. 136, 50 N. E.
791, 66 Am. St. 547, 41 L. R. A. 23; 1 Blackstone's Comm.
242; 3 Bouvier, Institutes 71; Cooley, Const. Lim. 575;
*Hopkins* v. *Commonwealth* (1842), 3 Met. (Mass.) 460. In
1 Blackstone's Comm. 242 it is said: "All jurisdiction
implies superiority of power; authority to try would be vain

and idle, without an authority to redress; and the sentence of a court would be contemptible unless that court had power to command the execution of it.''

Equity acts primarily *in personam.* An injunction decree can be enforced against one refusing to obey it, only by contempt proceedings. 16 Cyc 499. It is insisted by appellants that circuit courts may not imprison the Governor of the State for disobedience of an order relative to his official acts, and consequently there is no power to make the order.

Cases are rare where injunctive relief has been sought against a Governor, but the courts frequently have been called on to issue writs of mandate against chief executives in cases where it was claimed no executive discretion was involved. On this subject there is a conflict of authority, both in the adjudicated cases, and in textbook authorities. *Hovey* v. *State, ex rel.* (1891), 127 Ind. 588, 592, 27 N. E. 175, 11 L. R. A. 763, 22 Am. St. 663. In Cooley, Const. Lim. (7th ed.) 162, it is said: ''It may be proper to say here, that the executive, in the proper discharge of his duties under the constitution, is as independent of the courts as he is of the legislature.'' In *Gray* v. *State, ex rel.* (1880), 72 Ind. 567, it was held by this court that an action for mandamus would lie against the Governor and certain state officers, to compel the redemption of certain state bonds. This decision was on the ground that the duty enjoined on the Governor was in noway executive, but was purely ministerial.

In *Hovey* v. *State, ex rel., supra,* the Gray case was distinguished, and while it was not expressly overruled, it evidently would have been had such action been deemed necessary, as will appear from the authorities reviewed in the opinion and the court's conclusion thereon. One of these authorities is *People, ex rel.,* v. *Governor* (1874), 29 Mich. 320, 18 Am. Rep. 89 (opinion by Judge Cooley), from which the court on page 593, quoted the following: ''The

apportionment of power, authority and duty to the Governor, is either made by the people in the Constitution, or by the legislature in making laws under it; and the courts, when the apportionment has been made, would be presumptuous if they should assume to declare that a particular duty assigned to the Governor is not essentially executive, but is of such inferior grade and importance as properly to pertain to some inferior office, and consequently, for the purposes of their jurisdiction, the courts may treat it precisely as if an inferior officer had been required to perform it. To do this would be not only to question the wisdom of the constitution or law, but also to assert a right to make the Governor *the passive instrument of the Judiciary in* executing its mandates within the sphere of its own duties.''

After citing authorities that hold that the courts have jurisdiction to compel the chief executive of a state to perform an act which is purely ministerial in its nature, this court said on page 595: ''The cases above cited, as well as all others of the same import, seem to rest chiefly upon the *dictum* of Chief Justice Marshall, in the case of *Marbury* v. *Madison* [1803], 1 Cranch *137 [2 L. Ed. 60]. * * * We are not justified in assuming that Chief Justice Marshall would have used the same, or similar language, had the action been brought against the President of the United States; nor do we think the case is in point in an action against *the chief executive of a state.* * * * The cases therefore, above cited, resting on the case of *Marbury* v. *Madison,* in which it was held that the chief executive of a state may be compelled by *mandamus, to perform ministerial duties,* rests upon authority which does not sustain the conclusion reached, *and should not be followed.*'' In the same opinion, this court further said, on page 599, regarding the attempt of one department of our government to perform duties imposed on another: ''Such attempt would be usurpation, more dangerous to free government than the evil sought to be corrected. Should we attempt to control

the Governor, * * * we would be taking one step in the direction of absorbing the functions of the executive department of the State.''

In *Hartranft's Appeal* (1877), 85 Pa. St. 433, 27 Am. Rep., 667, cited with approval in *Hovey* v. *State, ex rel., supra,* the lower court issued a writ of attachment against Governor Hartranft, and some other state officers, to compel them to appear as witnesses before a grand jury that was investigating a matter growing out of riots which occurred in 1877. It was insisted by the governor that he was not liable to attachment for disobedience of the writ of subpoena. After setting out the provisions of the state Constitution (which are substantially the same as ours) the supreme court of Pennsylvania said on page 444: ''Who then shall assume the power of the people and call this magistrate to an account for that which he has done in discharge of his constitutional duties? If he is not the judge of when and how these duties are to be performed, who is? Where does the Court of Quarter Sessions, or any other court, get the power to call this man before it, and compel him to answer for the manner in which he has discharged his constitutional functions as executor of the laws and commander-in-chief of the militia of the Commonwealth? * * * If the Court of Quarter Sessions of Allegheny county can shut him up in prison for refusing to appear before it, * * * why may it not commit him for a breach of the peace * * * resulting from a discharge of his duties as commander-in-chief? * * * In other words, if from such analogy, we once begin to shift the supreme executive power, from him upon whom the constitution has conferred it, to the judiciary, we may as well do the work thoroughly and constitute the courts the absolute *guardians and directors of all governmental functions whatever.* * * * We need not waste time in the attempt to prove that this proposition is not allowable; that the Governor cannot thus be placed under the *guardianship and tutelage of the courts.*

To the people, under the methods prescribed by law, not to the courts is he answerable for his doings or misdoings.''

In *People, ex rel.,* v. *Morton, supra,* where a writ of mandamus was sought against a board of which Governor Morton was a member, the court said: ''But again, it is contended that in this case the executive is one of· a board of officers, and that the board may be compelled to act by mandamus. Conceding him to be one of a board of public officers, the duty is one that devolves upon him by virtue of his office. If the courts have not power over his person to enforce its decrees in the one case, they have not in the other. We have already referred to the discussion of Judge Cooley in the Sutherland case [*People, ex rel.,* v. *Governor, supra*] with reference to the grade of duties imposed upon the executive, including ministerial acts, together with those involving executive judgment and discretion; and without repeating his argument here, it appears to us that his reasoning is unanswerable and his conclusions correct.''

Judge Cooley says in *People, ex rel.,* v. *Governor, supra:* ''There is no very clear and palpable line of distinction between those duties of the governor, which are political, and those which are to be considered ministerial merely, and if we should undertake to draw one, and declare that in all cases falling on one side the line, the governor was subject to judicial process, and in all falling on the other he was independent of it, we should open the doors to an endless train of litigation. * * * However desirable a power in the judiciary to interfere in such cases might seem from the standpoint of interested parties, it is manifest that harmony of action between the executive and judicial departments would be directly threatened, and that the exercise of such power could only be justified on most imperative reasons.''

In *Jonesboro, etc., Turnpike Co.* v. *Brown* (1875), 8 Baxt. (Tenn.) 490, 35 Am. Rep. 713, the supreme court of Tennessee said: ''The Governor holds but one office, that is the office of chief executive. Any duty which he performs un-

der authority of law is an executive duty, otherwise we would have him acting in separate and distinct capacities. In some respects he would be the chief executive, an independent department of the government; as to other duties he would be a mere ministerial officer, subject to the mandate of any judge of the State, and we must assume also that the judge would have the power to imprison the Governor if he refused to obey his order, *for if the court has this jurisdiction the power to enforce the judgment* must follow.''

In *Frost* v. *Thomas* (1899), 26 Colo. 222, 56 Pac. 899, 77 Am. St. 259, an action was brought to restrain the governor from appointing officers for a newly-created county, under an alleged unconstitutional act. In its opinion the supreme court of Colorado said: ''But when the governor, in pursuance of his executive authority, recognizes an act as legal, and is proceeding to execute its provisions, the courts cannot directly interfere with the discharge of his duties under it, merely because it is alleged that such act is unconstitutional. * * * And if the judicial department of the state should attempt, in a proceeding of this character, to compel the chief executive to refrain from the performance of his duties, under the act creating the new county, it would be an *usurpation of authority* * * *.''

In *State* v. *Governor* (1856), 25 N. J. L. 331, 351, in a mandamus action against the governor, the supreme court of that state said: ''All executive duty is required to be executed *by a higher authority than the order of this court,* viz, by the mandate of the constitution. *The absence of discretionary power* cannot change the character of the act, or warrant the interposition of the judiciary. * * * While it is the acknowledged duty of courts of justice to exert all their appropriate powers for the redress of private wrongs, it is no less a duty sedulously to guard against any encroachment upon the right, or usurpation of the powers, of the co-ordinate departments of government. In the delicate and complicated machinery of our republican system, it is of the

utmost importance that each department of the government should confine itself strictly within the limits prescribed by the constitution.'' In both the New Jersey and Colorado cases, the proceedings were commenced in the supreme court.

In *Mississippi* v. *Johnson* (1866), 4 Wall. 475, 18 L. Ed. 437, a bill was sought to be filed in the Supreme Court of the United States by the State of Mississippi against Andrew Johnson, President, to enjoin him from enforcing certain alleged unconstitutional acts of congress. In denying the injunction, the court, by Chief Justice Chase, said: ''The single point which requires consideration is this: Can the President be restrained by injunction from carrying into effect an act of Congress alleged to be unconstitutional? * * * The duty thus imposed * * * is purely *executive* and *political*. An attempt on the part of the judicial department * * * to enforce the performance of such duties by the President might be justly characterized, in the language of Chief Justice Marshall, as 'an absurd and excessive extravagance.' * * * It will hardly be contended that Congress can interpose, in any case, to restrain the enactment of an unconstitutional law; and yet how can the right to judicial interposition to prevent such an enactment, when the purpose is evident and the execution of that purpose certain, *be distinguished, in principle, from the right to such interposition against the execution of such a law by the President?* * * * Suppose the bill filed and the injunction prayed for allowed. If the President refused obedience, it is needless to observe that the court is *without power to enforce its process.* If, on the other hand, the President complies with the order of the court and refuses to execute the acts of Congress, is it not clear that a collision may occur between the executive and legislative departments of the government? *May not the House of Representatives impeach the President for such refusal?* And in that case could this court interfere, in behalf of the President, thus endangered by compliance with its mandate, and restrain by

injunction the Senate of the United States from sitting as a court of impeachment? Would the strange spectacle be offered to the *public wonder of an attempt by this court to arrest proceedings in that court?* These questions answer themselves.''

Under our laws, writs of injunction and mandate issue only from circuit and superior courts, the Supreme and Appellate Courts not having such power, except in aid of their own jurisdiction. There are more than sixty circuit and more than a score of superior court judges in this State. The Governor is a member of numerous boards, the other members of which reside in various counties. Any circuit or superior court of the State might acquire jurisdiction of the person of the Governor in a suit against the members of such boards. Indeed, had any member of the board of election commissioners resided in Vanderburgh county, this cause might have been instituted there.

Circuit court judges may err. Indeed the power to determine a cause involves the power to decide it erroneously. The circuit court of Vanderburgh county might order the Governor by mandate (assuming the power to make and enforce such orders) to do a particular thing, and that of Lake county might enjoin him from doing a precisely similar act, and if he accept the construction of the law adopted by the Vanderburgh court, and obey it, he must pay the penalty of such obedience by removing his official residence to the Lake county jail. It might be possible, by various mandamus and injunction suits, to keep the Governor in jail during his entire term of office, because he obeyed the law as construed by various circuit courts in writs of mandate, provided he were not, in the meantime, impeached for such obedience; and it might turn out, after all, that the injunctions he disobeyed were erroneously issued. Surely it was never contemplated by the builders of the government of the sovereign State of Indiana that any such spectacle of anarchy should be exhibited for public bewilderment. And if it be

conceded that the court is without power to enforce its order of injunction against the Governor, the case against him ends, for, as said by Blackstone, the order of a court would be contemptible if there be no power of enforcement.

It is suggested that in performing a duty under the election laws, the Governor is merely acting as a member of the election board, and is not performing an executive duty devolving on him as governor. This idea is illusory. *Mississippi* v. *Johnson, supra; Georgia* v. *Stanton* (1867), 6 Wall. 50, 18 L. Ed. 721; 2 High, Injunctions (4th ed.) §1323. The Constitution prohibits the Governor from holding any other office. He can perform no official duty except it be enjoined on him as the Governor. The plaintiff in his complaint recognizes this, because he says: "Thomas R. Marshall, because he is Governor of Indiana," is a member of the board.

The overwhelming weight of American authority is against the recognition of any distinction between ministerial and executive acts of a governor in such cases as this. In 2 Spelling, Extra. Relief §1206, it is said: "the doctrine denying the right of interference even with respect to duties usually considered as ministerial is supported by the clear weight of authority." High, Extra. Legal Rem. §120; Merrill, Mandamus §97. But, in no event, can it justly be said that the Governor is acting in a ministerial capacity in refusing to enforce a statute because of its alleged unconstitutionality. Ministerial officers may not contest the constitutionality of a statute as a defense in proceedings against them for *disobeying* its mandates, though they may do so in proceedings to *enforce* the performance of a statute. 8 Cyc. 789; *Hall* v. *People* (1882), 90 N. Y. 498; *Newman* v. *People* (1896), 23 Colo. 300, 47 Pac. 278; *County Board, etc.*, v. *Kenan* (1893), 112 N. C. 566, 17 S. E. 485; *State* v. *Board, etc.* (1893), 56 N. J. L. 258, 28 Atl. 311.

The presumption is that a statute is constitutional. This presumption is recognized by the courts, is binding on the

executive, and surely binds ministerial officers. As said by
the supreme court of North Carolina in *County Board, etc.,*
v. *Kenan, supra:* "If every subordinate officer in the ma-
chinery of the state government is to assume an act of the
legislature to be in violation of the constitution and refuse
to act under it, it might greatly obstruct its operation and
lead to most mischievous consequences."

Our courts of last resort, in considering the question of the
constitutionality of a statute, "exercise the gravest duty of
a judge," and such duty will not be exercised in any doubt-
ful case, nor then, unless necessary, and on the application
of one interested. 8 Cyc. 787.

What is a ministerial act? This court has often defined it
as one which a person performs in a given state of facts, in
a prescribed manner, in obedience to the mandate of legal
authority, *without regard to, or the exercise of his own judg-
ment upon the propriety of the act being done. Flournoy* v.
*City of Jeffersonville* (1861), 17 Ind. 169, 79 Am. Dec. 468;
*Galey* v. *Board, etc.* (1910), 174 Ind. 181, 91 N. E. 593.

The plaintiff in this case sues the Governor because he has
decided to execute a law relating to submitting a certain
question to the voters. Appellee claims it unnecessary to
submit the question—the proposed new Constitution—be-
cause, even if ratified, it will be void. Had the Governor
decided the proposed instrument will be void if ratified,
and had he further decided that because thereof it was not
necessary to execute the law of 1889, this suit might not
have been brought by appellee. But no one will contend
that the Governor could be excused for violating the act of
1889, requiring him to submit the question, unless he had
previously decided, in the faithful exercise of his judgment
and discretion, that if ratified the proposed Constitution
would be invalid.

In *Carr* v. *State* (1911), 175 Ind. 241, 93 N. E. 1071, 32
L. R. A. (N. S.) 1190, this court said: "The power given to
courts to overthrow an act of the legislature is the highest

and most solemn function with which they are vested.'' This rule is universally recognized. Can it be said that a governor in deciding to disregard a statute is vested with a lower or less solemn function? If not, can it, with any pretense of reason, be said that in such case the act is ministerial, because it involves *no exercise of judgment?*

Never has it been claimed that the law is an exact science. Is there concealed somewhere in the universe a device which automatically registers with mathematical precision the correct answers to constitutional questions? If there is, and if the governor must be deemed, in performing his duties, to have availed himself of the use thereof, it seems unfortunate that the courts might not discover the device. That the determination of such questions involves the exercise of the highest judgment and discretion is shown by this court's opinions where former decisions have been overruled, and, even in the same case.

In *Smith* v. *Board, etc.* (1909), 89 N. E. (Ind.) 867— a case of interest to nearly all the taxpayers and citizens of Indiana—it was held, without dissent, that many sections of the act concerning highways were unconstitutional and void. The opinion was filed November 18, 1909. A petition for rehearing was filed and granted, and it was finally held, in an opinion filed January 25, 1910, that said sections in controversy were valid and constitutional. *Smith* v. *Board, etc.* (1910), 173 Ind. 364, 90 N. E. 881. Had the Governor, instead of this court, in November, 1909, decided these sections unconstitutional and refused to enforce them, can it be said justly that such action would have been merely ministerial?

While the right, by mandate, to order the Governor to perform purely ministerial duties has been recognized in some early cases by this court, it was held later in *Hovey* v. *State, ex rel.* (1891), 127 Ind. 588, 596, 27 N. E. 175, 11 L. R. A. 763, 22 Am. St. 663, that the cases on which such authority rested ''should not be followed,'' and this holding

is in consonance with the weight of authority. No state court has ever held that a governor may be enjoined from executing a statute because of its alleged unconstitutionality. The Supreme Court of the United States has held that the President could not be enjoined. *Mississippi* v. *Johnson, supra.*

Some cases have been cited showing injunctions granted by Federal courts against state executive officers in relation to the enforcement of acts of state legislatures, void by reason of conflict with the Federal Constitution. These cases are not in point here. The distinction was pointed out in *Bates* v. *Taylor* (1889), 87 Tenn. 319, 11 S. W. 266, 3 L. R. A. 316, in the following language: ''Now, the most that can be said of these cases is that they show the jurisdiction of the Federal courts to restrain the Governor of a state from doing a wrongful act to the injury of individual rights. It is not even intimated in any one of them that the State Courts have any such jurisdiction. There is a wide difference between the relation of the Federal judiciary and the State judiciary to the Governor of the State, and because of that difference the Federal decisions referred to are not at all in point in this case. A State's judiciary sustains the same relations to its Governor that the Federal judiciary does to the President of the United States, and as a State court, by reason of that relation, has no jurisdiction to coerce or restrain the Governor with respect to his official duties, so the Federal courts, for the same reason, have no power to interfere with the official actions of the President.''

The doctrine of recognizing a power in the courts to enjoin a governor from executing the acts of a coördinate department of the government would involve a theory of tutelage and guardianship of the executive, by the judiciary, as novel as it would be intolerable. The inevitable result of such rule would be the absorption of all governmental power by the judicial department. Legislatures might just as well be enjoined in the first instance from enacting laws, for as

said by the Supreme Court of the United States, there is no difference in principle; and forms may always be disregarded. The expense of publishing the proposed Constitution in the acts of 1911 might have been saved, by enjoining the legislature from submitting it to the people, and no different principle would have been involved from the one here. *Mississippi* v. *Johnson, supra.*

The analysis of government into three powers is as old as Aristotle, but to Montesquieu must be given the credit of developing the necessity of a separate department for the exercise of each of the three powers, to the end that civil liberty may be secured. In the formation of our American States, this division of power, except as expressly qualified, was made a fundamental principle. *Mauran* v. *Smith* (1865), 8 R. I. 192, 5 Am. Rep. 564.

Daniel Webster said: "A separation of departments, so far as practicable, and the preservation of clear lines of division between them, is the fundamental idea in the creation of all our constitutions, and, doubtless, the continuance of regulated liberty depends on *maintaining these boundaries.*" 4 Webster's Works 122.

The history of the decline and fall of republics, from the Grecian democracies to the time of the adoption of our American Constitutions, is a story of usurpation of power, growing from slight encroachments, increasing gradually, sometimes by imperceptible advances, but each infringement furnishing an excuse for another trespass, until the governmental structure either fell or became the citadel of arbitrary power.

A court of equity regards the substance, and not the form of an act. This judgment, stripped of its forms, stands revealed as the edict of the Marion Circuit Court, addressed to the electors of Indiana, and forbidding them to incorporate into their organic law the changes proposed. Such in form is not the order, but by enjoining the Governor and other officers from furnishing the voters with a certain

kind of ballot—their only means of acting—the substantial end is reached of enjoining the electors from voting on a proposed constitutional change.

Our American constitutions were erected by architects of consummate skill. Their foundations were supposed to be indestructible. Warned by the history of the Grecian and Italian republics, our fathers erected what they supposed were insurmountable barriers between the different departments of government. There are found in all the constitutions similar provisions in this respect; that of Indiana being as follows: "No person charged with official duties under one of these departments, shall exercise any of the functions of another." Constitution, Art. 3.

Our type of Constitution has been copied by nearly all the governments of the western hemisphere, has served as the model for modern European republics; and at this time, just when the people of the world's most densely populated empire are seeking relief from usurped power by adopting our form of charter, ordained "to the end that justice be established, public order be maintained and liberty perpetuated," it is indeed unfortunate if the Supreme Court of Indiana should adopt a rule, which only a few months ago the Supreme Court of the United States declared, without dissent, involves a power in the judiciary to build a new government on the ruins of the present one. *Pacific States, etc., Tel. Co.* v. *Oregon* (1912), 223 U. S. 118, 32 Sup. Ct. 224, 56 L. Ed. 377. The lower court erred in holding that the Governor may be enjoined.

Appellants contend that the court erred in concluding as a matter of law that the provision of the proposed Constitution, empowering the General Assembly to legislate in reference to the initiative and referendum, is in conflict with the provisions of the Federal Constitution, which guarantees to each state a republican form of government; that the question is a legislative or political one over which the courts have no jurisdiction.

When this cause was heard in the circuit court there was pending in the Supreme Court of the United States the case of *Pacific States, etc., Tel. Co.* v. *Oregon, supra,* which involved this identical question. The appellee here, and his learned counsel, Hon. Addison C. Harris, as *amici curiae,* by leave of court, filed a brief in the Oregon cause, contending there as in the Marion Circuit Court, for the rule declared by the latter.

The Oregon case was decided in February, 1812. The opinion was rendered by Chief Justice White, all the justices concurring. In the course of the opinion it was said on page 133: "We premise by saying that while the controversy which this record presents is of much importance, it is not novel. It is important, since it calls upon us to decide whether it is the duty of the courts or the province of Congress to determine when a State has ceased to be republican in form and to enforce the guaranty of the Constitution on that subject. It is not novel, as that question has long since been determined by this court conformably to the practice of the Government from the beginning to be *political* in character, and therefore not cognizable by the judicial power, but solely committed by the Constitution to the judgment of Congress. * * * Before immediately considering the text of §4 of Article IV, in order to uncover and give emphasis to the *anomalous and destructive effects upon both the state and national governments which the adoption of the proposition implies,* as illustrated by what we have just said, let us briefly fix the inconceivable expansion of the judicial power and the *ruinous destruction of legislative authority in matters purely political* which would necessarily be occasioned by giving sanction to the doctrine which underlies and would be necessarily involved in sustaining the propositions contended for. * * * And as a consequence of the existence of such judicial authority a power in the judiciary must be implied, unless it be that *anarchy is to ensue, to build by judicial action upon the ruins of*

*the previously established government a new one,* a right
which by its very terms also implies the power to control
the legislative department of the Government of the United
States in the recognition of such new government and the
admission of representatives therefrom, as well as to strip
the executive department of that government of its other-
wise lawful and discretionary authority. Do the provisions
of §4 Art. IV bring about these strange, far-reaching, and
injurious results? That is to say, do the provisions of that
Article *obliterate the division between judicial authority
and legislative power upon which the Constitution rests?*
In other words, do they authorize the judiciary to substitute
its judgment as to a matter purely political for the judg-
ment of Congress on a subject committed to it and *thus over-
throw the Constitution* upon the ground that thereby the
guaranty to the States of a government republican in form
may be secured, a conception which after all rests upon the
assumption that the States are to be guaranteed a govern-
ment republican in form by destroying the very existence
of a government republican in form in the nation. We
shall not stop to consider the text to point out how absolutely
barren it is of support for the contentions sought to be based
upon it, since the repugnancy of those contentions to the let-
ter and spirit of that text is so conclusively established by
prior decisions of this court as to cause the matter to be ab-
solutely foreclosed. In view of the importance of the sub-
ject, the apparent misapprehension on one side and seeming
misconception on the other suggested by the argument as to
the full significance of the previous doctrine, we do not con-
tent ourselves with a mere citation of the cases, but state
more at length than we otherwise would the issues and the
doctrine expounded in the leading and absolutely control-
ling case—*Luther* v. *Borden* [1849], 7 How. 1 [12 L. Ed.
581]. * * * It is indeed a singular misconception of
the nature and character of our constitutional system of gov-

ernment to suggest that the settled distinction which the doctrine just stated points out between judicial authority over justiciable controversies and legislative power as to purely political questions tends to destroy the duty of the judiciary in proper cases to enforce the Constitution. * * * As the issues presented, in their very essence, are, and have long since by this court been, definitely determined to be political and governmental, and embraced within the scope of the powers conferred upon Congress, and not therefore within the reach of judicial power, it follows that the case presented is not within our jurisdiction.''

It would seem that nothing need be added here to what was said by the Supreme Court of the United States, were it not for the fact that in this case the further question is presented of a conflict with the ordinance of 1787, and the Virginia act of 1783.

In 1783, when the Northwest Territory was a wilderness, it was ceded by Virginia to the United States. In the act of cession it was provided that the territory ceded should be formed into distinct republican states. The ordinance of 1787 provides, among other things, that the inhabitants of the territory shall ever be entitled to a proportionate representation of the people in the legislature, and that the states formed in the territory shall be republican. The right of trial by jury (of twelve) was secured, and it was guaranteed that the title of the Indians to their lands should not be taken from them except by their consent. Article four provided that the territory and the states that may be formed therein ''shall ever remain a part of this Confederacy of the United States of America, subject to the Articles of Confederation.''

It is appellee's theory, adopted by the trial court, that the provisions of the above two instruments are binding here, and that the initiative and referendum clause, and other matters in the proposed Constitution, are in conflict with the provisions of each of the above instruments, and

that the court has jurisdiction to declare the proposed Constitution void, for such reasons.

That the people of any of the sovereign states carved out of the Northwest Territory are bereft of power, for instance, to reduce the number of jurors composing a jury to less than twelve, regardless of amendments to State or Federal Constitutions, because of the provisions of the ordinance of 1787, would be but one of the many remarkable situations that would result from the position taken by appellee, and the lower court. On such theory, we are confronted with a situation, not only as was said in *Pacific States, etc., Tel. Co.* v. *Oregon, supra,* as between anarchy or building "by judicial action upon the ruins of the previously established government, a new one," but even such new one established by a judicial oligarchy must ever be fettered by the provisions of the ordinance of 1787. It would appear that the statement of the proposition suggests the proper answer.

The question involved on this branch of the case is purely political, and one over which the courts have no jurisdiction, and the Marion Circuit Court erred in holding otherwise.

Appellants next claim that the facts found do not warrant injunctive relief, because no substantial, positive injury is made to appear; because the cost to plaintiff of submitting the proposed Constitution is too trifling for consideration; that neither in person nor in property can appellee be affected, unless the instrument be ratified next November by the voters, which renders the question a speculative one merely; and because courts have no jurisdiction to enjoin the people from making constitutions or from voting. That a taxpayer may, by a suit in equity, enjoin the unlawful levy of a municipal tax, or enjoin the unlawful expenditure of public funds, whether he owns much or little property, is too well settled to require the citation of authorities. But this action cannot be fairly termed a taxpayer's suit. That a paragraph of complaint must pursue a single definite theory is settled. Our code (§343 Burns 1908, §338

R. S. 1881) requires that each cause of action shall be distinctly stated in separate paragraphs, where the complaint contains more than one cause. While this complaint alleges that appellee is a taxpayer, and that the action is brought for all the electors and taxpayers of the State, it cannot be believed that appellee and his eminent counsel—both of whom have devoted their lives to the practice of law in Indiana, and are thoroughly familiar with our code—intended to state in a single paragraph of complaint two or more causes of action. And while no demurrer nor motion to separate was filed in the court below, it is proper here to consider the theory of the complaint, which, in case of doubt, is determined by the general scope and character of the pleading. The theory most prominent in the complaint is that of a cause of action brought by a citizen and elector, and the references therein to the plaintiff as a taxpayer should be either disregarded as surplusage, or regarded as subsidiary averments in a complaint treated as filed by the plaintiff in his capacity as citizen and elector. That appellee himself attaches but little importance to the taxpayer feature of his complaint is evidenced by the scant attention given to it in his brief.

Even if the complaint be deemed a suit in equity by a taxpayer, the facts found do not entitle appellee to any substantial relief. Expenses of holding state elections are borne in part by the treasuries of the several counties, and in part by that of the State. The court finds that the total cost to be occasioned will aggregate from $1,000 to $2,000, and that such expense will be borne by the state and the several county treasuries. It fails to find any specific amount to be borne by the treasury of the State, or that of Marion county—the only two in which plaintiff is interested. If all the expense were to be borne by the state treasury—which cannot occur—plaintiff's share of the $1,000 would be about three cents—an amount so trifling as to invoke the doctrine of *de minibus non curat lex.*

1 Pomeroy, Eq. Rem. §331; 1 High, Injunctions §22; *State, ex rel.,* v. *Thorson* (1896), 9 S. Dak. 149, 68 N. W. 202, 3 L. R. A. 582.

Only one case similar to this one has been called to our attention. But if appellee's contention, that the proposed Constitution is not a new one, but merely a series of proposed amendments, be correct, then the case of *State, ex rel.,* v. *Thorson, supra,* is in point on every proposition involved in this branch of the discussion. In that case a suit was filed in the supreme court of South Dakota to enjoin the secretary of state from certifying to county officers a proposed constitutional amendment. The court said: "The relator is an elector and taxpayer. Defendant intends to, and will, unless restrained by injunction or other legal process, certify the question as a proposed constitutional amendment. The relator contends that the passage of the resolution, and the submission of the question embraced therein, are steps in an attempt to amend the state constitution; that the methods prescribed for its amendment have not been complied with; therefore defendant has no authority to certify the same. * * * He claims * * * that the constitution will not be changed, whatever reply may be returned. * * * It is a familiar principle that substantial and positive injury must always be made to appear to the satisfaction of a court before it will grant an injunction, and acts which, however irregular and unauthorized, can have no injurious results, constitute no ground for relief. 1 High, Injunction §9. The party seeking an injunction must show, not only a clear legal right, but a well grounded apprehension of immediate injury. An injunction will not be granted where the injury is doubtful, or the violation of complainant's rights is merely speculative. Injury material and actual, not fanciful or theoretical, or merely possible, must be shown as the necessary or probable result of the action to be restrained. * * * This court has no power to examine an act of the legislature generally

and declare it unconstitutional. The limit of our authority in this respect is to disregard, as in violation of the constitution, any act or part of an act which stands in the way of the legal rights of the suitor before us. * * * It has not been shown, nor can it be imagined, in what manner the relator will be injured by the contemplated action of defendant. If the legislature has proceeded properly, and its proposed amendment shall be ratified by the people, the relator will have no legal cause of complaint, because, as a good citizen of the state, he will be bound to cheerfully accept the lawfully expressed will of a majority of its sovereign electors. If, on the other hand, the action of the legislature was such as to render any answer to the question inoperative, the constitution will not be modified, and no one will be affected. Any additional burden which might result to relator, as a taxpayer, by reason of submitting this question at a general election is too trifling, fanciful, and speculative for serious consideration. * * * There is another view, which involves the structure of the state government and the relation of its several departments. Should it be conceded that the relator has such an interest in the matter as entitles him to be heard, or that the action involves a question of such public concern as would warrant an attempt by the attorney-general to obtain an injunction, could this court issue it? *No precedent for such an action has been presented by counsel or discovered by the court.* In discussing this phase of the case it will be assumed an amendment of the constitution was intended requiring the concurrent action of the legislature and electors. The former has acted. Its action will be communicated to the latter by means of defendant's certificate. Until the latter shall have expressed their approval, the proceeding is incomplete, and the constitution will remain unchanged. The proposed amendment is on its way to the electors. Can this court, at this time, impede its progress? Can it be called upon to anticipate conditions which may never exist?

Can it interpose its process between the legislature and elect-
ors, who are alone clothed with power to modify the fun-
damental law, before both have acted, and while the matter
is pending and incomplete? The powers of the state govern-
ment are divided into three distinct departments—the leg-
islative, executive and judicial. The powers and duties of
each are prescribed by the constitution. Const. Art. 2.
Power to amend the constitution belongs exclusively to
the legislature and electors. It is legislation of the most
important character. This court has power to determine
what such legislation is, what the constitution contains, but
not what it should contain. It has power to determine what
statutory laws exist, and whether or not they conflict with
the constitution; but it cannot say what laws shall or shall
not be enacted. It has the power—and it is its duty, when-
ever the question arises in the usual course of litigation,
wherein the substantial rights of any actual litigant are in-
volved, to decide whether any statute has been legally en-
acted, or whether any change in the constitution has been
legally effected, but it will hardly be contended that it can
interpose in any case to restrain the enactment of an un-
constitutional law. *Mississippi* v. *Johnson* [1866], 4 Wall.
[475], 500 [18 L. Ed. 437]. If the legislature cannot be
enjoined when engaged in the enactment of unconstitutional
statutes, it and the electors cannot be enjoined when en-
gaged in an unwarranted attempt to amend the constitution.
*To issue an injunction in this action would be to enjoin the
legislature and electors in the exercise of their legislative
duty.* Suppose a bill having passed the legislature, is in
possession of the governor, or, to make the analogy more
nearly complete, suppose it is being conveyed to the execu-
tive by an officer of the legislature, would anyone imagine
the progress of the messenger could be arrested by an injunc-
tion? The inquiry answers itself. *Is there any distinction
in principle or reason between such a case and the case un-
der discussion? Clearly none.* An injunction cannot be

granted to prevent a legislative act by a municipal corporation. Comp. Laws, §4650. The Code expresses the settled doctrine in this respect. Spelling, Extra. Relief §688. If courts cannot interfere with the legislative proceedings of a city council, they certainly cannot with like proceedings in the legislature itself. If they cannot prevent the legislature from enacting unconstitutional laws, they cannot prevent it and the electors from making ineffectual efforts to amend the constitution. The fact that the present attempt is without precedent is of much weight against it. *Mississippi* v. *Johnson, supra.*''

The cogent reasoning of the South Dakota court applies with equal force here, for no one will pretend that the provisions of our proposed Constitution can ever have the effect of law unless approved by the people next November: And not then, unless free of conflict with the Federal Constitution, and unless proposed in accordance with the terms of the present Indiana Constitution. The voters of the State may reject the instrument—and the only presumption now allowable is that they will do so if it violates the Federal Constitution, or was proposed in violåtion of our present one. In such event, the preparation of briefs here, aggregating five or six hundred printed pages; the oral argument, occupying thrice the time usually allowed; the long time necessarily spent by this court in considering this appeal, with the resultant further postponement in considering others long pending, and where the questions are real, and not moot; the expense occasioned to the State and the parties by this appeal, aggregating vastly more than that of submitting the proposed instrument, will have been each and all in vain, for the writer feels assured that appellee will not contend that his motive in bringing this suit was to save his share of taxes to be caused by the submission, and amounting, as appellants' counsel facetiously remark, to the ''price of a postage stamp''. As appellants well say, if this suit be deemed one for all the taxpayers and voters

of the State, no possible relief is demandable, for the simple reason that the voters and taxpayers of the State hold in their own hands the power of issuing an injunction from which no appeal is permitted, by simply discharging their duty at the polls.

But in the opinion of the writer, the decision of this really moot question, in favor of appellee, includes a new and erroneous departure from established doctrines of the division of govermental powers. Holding elections and voting, involve the exercise of political powers only, and this injunction is really against the voters of the State. Heretofore courts of equity have ever been denied such power. *Landes* v. *Walls* (1903), 160 Ind. 216, 66 N. E. 679; *Hovey* v. *State, ex rel., supra; Smith* v. *Myers* (1887), 109 Ind. 1, 9 N. E. 692, 58 Am. Rep. 375; 1 Pomeroy, Eq. Rem. §§324, 331, 332; *Georgia* v. *Stanton* (1867), 6 Wall. 50, 18 L. Ed. 721; *Winnett* v. *Adams* (1904), 71 Neb. 817, 99 N. W. 681, and cases cited; *Fletcher* v. *Tuttle* (1894), 151 Ill. 41, 37 N. E. 683, 25 L. R. A. 143, 42 Am. St. 220; *Giles* v. *Harris* (1903), 189 U. S. 475, 23 Sup. Ct. 639, 47 L. Ed. 909; *Larcom* v. *Olin* (1893), 160 Mass. 102, 35 N. E. 113; *Hardesty* v. *Taft* (1865), 23 Md. 512, 87 Am. Dec. 584; *Story* v. *Jersey City, etc., Road Co.* (1863), 16 N. J. Eq. 13, 84 Am. Dec. 134; *Jones* v. *Black* (1872), 48 Ala. 540; *Holmes and Gray* v. *Oldham* (1877), 1 Hughes 76, Fed. Cas. No. 6,643; *Weber* v. *Timlin* (1886), 37 Minn. 274, 34 N. W. 26; *Smith* v. *McCarthy* (1867), 56 Pa. St. 359.

A further particular reason why courts should not enjoin the submission of proposed constitutional amendments by reason of some alleged infirmity, is because they must be voted on, if ever, on a fixed day. It might happen that this court should decide, as in the highway case of *Smith* v. *Board, etc., supra,* against the constitutionality of an amendment proposed for submission, and in the meantime, on petition for rehearing, *after the election,* reach a different conclusion. Such a situation might arise in this case. By

assuming jurisdiction of such cases, the courts may deprive the people of the privilege of amending their constitutions by their confessedly erroneous action, the correction of which is prevented by lapse of time.

My apology for this long dissenting opinion is found in the gravity of the questions presented, and which is fully recognized by the Supreme Court of the United States and those of other states, but which is not, in my judgment, properly realized in the majority opinion.

There was a time in the history of the English people when, by the combined usurped powers of the executive and the courts, members of parliament were cast into prison, and the constitutional authority of parliament was insulted and defied by the courts until it almost ceased to exist. The Puritans, in despair, sought an asylum in America. Macaulay's History of England 90. The court of Star-Chamber, guiltiest of all in usurping power, was abolished in 1640. 4 Blackstone's Comm. 267; Hallam, Const. History 258, 292. Since then no English court has deigned to dictate to parliament what laws it shall, or shall not, enact.

The descendants of the Puritans took no small part in framing our early American Constitutions. In all these the independence of the legislative department was thought to be impregnably guarded. Constitution Art. 4, §§8, 9, 16. All power is inherent in the people (Constitution, Art. 1, §1), and they alone may exercise the paramount legislative power of formulating a constitution. *State, ex rel.,* v. *Thorson, supra.* If the courts may dictate to the people in advance what provisions they may or may not insert in their constitutions, they certainly cannot be denied the lesser power of dictating to the General Assembly what laws it may or may not enact.

The plaintiff here comes into court, demanding in advance of the electors' expression of approval or disapproval, of what he claims is a series of constitutional amendments, the determination and adjudication of their future validity,

if approved, and if, in the opinion of the court, there is a prospective invalidity, that the voters of Indiana be restrained from voting on the proposition, by enjoining the Governor and other officers from supplying them with ballots that are so printed as to enable them to express their choice. This remarkable prayer was granted by the lower court, and is sanctioned by the majority opinion here. Since 1640 the courts of English speaking peoples have resolutely and invariably denied the existence of any such power, and I most earnestly protest against its revival now.

For the foregoing reasons, and for others set out in appellants' briefs, the circuit court had no jurisdiction of the cause of action, and the judgment should be reversed, with instructions to sustain the motions in arrest of judgment.

Where the lower court has no jurisdiction of the subject matter of the action, it is improper for this court to consider other questions urged. *State, ex rel.,* v. *Thorson, supra.*

Spencer, J., concurs in the above dissenting opinion.

NOTE.—Reported in 99 N. E. 1, 99 N. E. 29. See, also, under (1) 8 Cyc. 806; (3) 8 Cyc. 714; 36 Cyc. 940; (5) 36 Cyc. 1152; (6) 8 Cyc. 733; (8) 8 Cyc. 741; (9) 8 Cyc. 721; (10) 8 Cyc. 728, 796; (11) 8 Cyc. 854; (13) 22 Cyc. 881, 885; (14) 8 Cyc. 848; (15) 22 Cyc. 910.